UNITED STATES of America, Appellee,

v.

Tyrone J. KELLEY et al., Appellants.

Nos. 75–1388, 75–1408 and 75–1409.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1975.

Decided Nov. 26, 1975.

Certiorari Denied March 22, 1976. See 96 S.Ct. 1471.

---

616

Michael J. McKitrick, Clayton, Mo., for Kelley.

William Terry Burnet, St. Louis, Mo., for Simmons.

Joseph D. Lehrer, St. Louis, Mo., for Wilson.

Barry A. Short, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before CLARK,* Associate Justice, and LAY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Theopolis Wilson, Thomas Simmons and Tyrone Kelley appeal their convictions of aiding and abetting the armed robbery of a federally chartered bank in Moberly, Missouri. They were jointly tried and convicted in district court. We affirm the conviction of each defendant.

On January 10, 1975, three men entered, and robbed at gun point, the City Bank and Trust Company of Moberly, Missouri. One of the principals, Gary Roberson, turned government's witness before trial and implicated the other participants in the plan.[1]

At trial, Roberson was the first witness called by the government. Over the objection of defense counsel, he was allowed to relate pertinent statements made by the defendants in furtherance of the common plan to rob the bank. He testified that on January 9, 1975, he received a visit from defendant Tyrone Kelley at his home in Kansas City, Missouri. At that time, Kelley told Roberson that he (Kelley) and defendant Theopolis Wilson had a "bank job" set up in Moberly, Missouri. Kelley also stated that Baron Hemphill was also willing to participate. Roberson told Kelley that he would seek to enlist the support of Charles Rose. Tentative arrangements were made to meet at Roberson's house the next day. After Kelley departed, Roberson contacted Rose who agreed to participate in the scheme.

On January 10, 1975, the plan was carried out. Roberson, Kelley, Hemphill and Rose met at the residence of Kelley's mother. This group joined Wilson and Simmons. At approximately 12:30 p. m., the six men drove from Kansas City to Moberly, Missouri, arriving there at approximately 4 p. m. They then proceeded to the residence of Robert Cason, an acquaintance of Theopolis Wilson.

Shortly after their arrival, Roberson, Rose, Hemphill and Wilson drove to the bank for the purpose of acquainting themselves with the neighborhood. Upon their return to Cason's house, Roberson, Wilson, Kelley and Simmons discussed how many cars were needed. Thereupon Wilson, Simmons and Rose departed and returned with two cars, which later testimony conclusively showed were stolen. Defendant Simmons told the others that two cars had

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. The other principals who entered the bank were identified at trial as Baron Hemphill and Charles Rose. Defendants Wilson, Simmons and Kelley did not enter the bank with the other principals.

been obtained for the robbery. Simmons also had a dent puller[2] in his possession at this time.

At this point, Roberson, Wilson, Kelley, Rose and Hemphill proceeded outside. Kelley and Wilson told the others that everything, including the coveralls and gloves, was in the car. Roberson fetched his shotgun and entered the car with Rose and Hemphill. The three men drove to the bank and robbed it at gunpoint.

After exiting the bank, the principals drove to the second stolen car and started back to Cason's house. They became lost however, and decided to hide the money in a trash can. After hiding the money, they abandoned the car and started walking back to Cason's. They then encountered Simmons and Wilson in Wilson's car, and were, at that time, driven back to Cason's house. Thereafter Roberson and Wilson drove to the place where the money was hidden. Roberson was arrested as he approached the trash can. Wilson ran from the scene and was wounded by a shotgun blast from pursuing law enforcement personnel.

Robert Cason also testified at trial. He stated that defendants Wilson and Kelley had visited him at his Moberly residence on the morning of January 9, 1975. He stated that all the participants in the crime had come to his home at approximately 4 p. m. on January 10. He related various comings and goings of the group, including the return of Wilson from the attempt to recover the money. His testimony in this regard connected Wilson to the scheme in at least two important respects; Cason observed blood on Wilson's pant leg at this time and Cason heard Wilson exclaim, "Let's get out of here. Trap." He also identified a jacket and hat which Wilson was wearing when he left to retrieve the money. When Wilson returned, according to Cason, he was not wearing the jacket or hat. A Missouri state trooper testified that the same jacket and hat

were found near the trash can where the money was hidden.

## I. ADMISSIBILITY OF THE EXTRA-JUDICIAL STATEMENTS

Each defendant argues that the trial judge erred by ruling that Roberson's testimony as to extra-judicial statements of the coparticipants was admissible prior to an independent showing of concert of action. We disagree.

It is well settled that if a concert of action is established by independent evidence, statements made in furtherance of the unlawful association are not hearsay and are admissible. *United States v. Frol,* 518 F.2d 1134, 1136 (8th Cir. 1975); *United States v. Sanders,* 463 F.2d 1086, 1088 (8th Cir. 1972). The order of proof is within the discretion of the trial judge. *Brinlee v. United States,* 496 F.2d 351, 354 (8th Cir.), *cert. denied,* 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974). The statements may be conditionally admitted subject to being "connected up" by subsequent independent proof of concert of action. *United States v. Sanders, supra,* 463 F.2d at 1088; *United States v. Reed,* 446 F.2d 1226, 1231 (8th Cir. 1971); *Fabian v. United States,* 358 F.2d 187, 192 (8th Cir. 1966). The requisite showing of concert of action may be established by evidence of a likelihood of illicit association between the declarant and the defendants. *United States v. Frol, supra,* 518 F.2d at 1136; *United States v. Sanders, supra,* 463 F.2d at 1088. The quantum of evidence required to show unlawful association must be " . . . at least enough to take the question to the jury." *United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974).

The independent evidence linking defendant Wilson to the concert of action was overwhelming. The testimony of Cason established that Wilson visited Cason's residence the day before the robbery. At trial a salesperson employed by a local Kansas City drug store identified

---

**2.** A dent puller is a device commonly used to start an automobile without an ignition key.

Wilson as having purchased a duffel bag on the morning of the robbery. The duffel bag was later identified as the bag in which the stolen money was carried from the bank.

Furthermore, Roberson offered independently admissible testimony that Wilson accompanied the other participants to Moberly on the day of the robbery. Before the robbery, according to Roberson, Wilson, Rose and Simmons departed Cason's residence and returned with two stolen cars. After the robbery, Wilson and Simmons picked up the principals in Wilson's Vega.

Roberson further testified that Wilson accompanied him to recover the money from the trash can. This testimony was supported by a great deal of corroborative evidence. A Missouri state patrolman testified that he found a blue hat and jacket near the place where the money was hidden. Cason testified that Wilson was wearing the same jacket and hat at the time Wilson purportedly departed to recover the money. Cason also testified that Wilson returned with blood on his pant leg. And when he reached the Cason residence, Cason heard Wilson utter the spontaneous declaration, "Let's get out of here. Trap." Roberson testified that a shot was fired shortly after he was apprehended. This testimony was corroborated by Sergeant Relford, the policeman who fired the shot. Relford testified that he fired when the person accompanying Roberson started to flee the scene.

The independently admissible evidence of Simmons' participation was also convincing. Roberson testified that Simmons also accompanied the other participants to Cason's residence in Moberly on the day of the robbery. Cason confirmed that Simmons had arrived at his residence with the others on the day of the robbery. Shortly before the robbery, according to Roberson, Simmons departed with Wilson and Rose and returned with the two stolen cars which were later used in the robbery. In addition, Roberson testified that Simmons had a dent puller in his possession at this time. The dent puller was subsequently found by a Moberly policeman in Cason's front yard. Furthermore, Roberson testified that Simmons and Wilson drove himself and the other principals back to Cason's residence after the robbery.

The independent evidence of Kelley's participation also established a likelihood of illicit association. Roberson testified that two of the three principals in the robbery, Rose and Hemphill, met Kelley at his mother's house immediately before they departed for Moberly on January 10. Kelley then accompanied all of the participants to Moberly. Cason confirmed that Kelley arrived at his residence with the others on the day of the robbery. Kelley was also present when Roberson, Rose and Hemphill departed for the bank. Furthermore, Kelley's declaration against his penal interest implicated him directly in the scheme. Roberson testified that Kelley told him that " . . . he and Theopolis [Wilson] had a 'B' [meaning bank] set-up in Moberly." While this statement would arguably be inadmissible hearsay in the absence of other corroborating evidence, we feel the circumstances above (e. g. Kelley's association with Wilson) indicates its trustworthiness.

█ In short, our review of the record convinces us that the independently admissible evidence was sufficient to link Wilson, Simmons and Kelley to the witness Roberson and the unlawful association.[3] Therefore, Roberson's testimony as to the extra-judicial statements made

---

**3.** Defendants argue that the district court erred in failing to make a specific finding that the government had proven concert of action beyond a reasonable doubt. This argument misses the mark since, in our view, the critical inquiry is whether sufficient "connecting up" proof was in fact offered by the government.

In denying defendants' motions for directed acquittal, the trial judge held, in effect, that the requisite independent showing of concert of action had been made. *See United States v. Acuff,* 410 F.2d 463, 466 (6th Cir.), *cert. denied,* 396 U.S. 830, 90 S.Ct. 82, 24 L.Ed.2d 81 (1969).

in furtherance of that unlawful association was admissible.[4]

## II. CONFRONTATION

At trial, Roberson was permitted to relate a statement made by defendant Kelley that Kelley and defendant Wilson had a bank job set up in Moberly. Kelley, the declarant, was protected by the privilege against self-incrimination and did not testify at trial. Relying primarily on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Wilson argues that the declarant's unavailability for cross-examination violated his sixth amendment right of confrontation. We disagree.

In *Bruton,* a confession implicating both petitioner and a codefendant was admitted subject to a cautionary instruction warning the jury that the confession was inadmissible hearsay against the petitioner. The Supreme Court held this to be a violation of the confrontation clause, notwithstanding the cautionary instruction, because a substantial risk existed that the jury would consider the confession in determining the petitioner's guilt. However *Bruton* involved no recognized exception to the hearsay rule.[5] Indeed it has become well settled

that the *Bruton* rule is limited to circumstances where the out-of-court statements are inadmissible hearsay.[6]

This case involves a recognized exception to the hearsay rule and is therefore controlled by *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). In *Dutton,* an extra-judicial statement of an alleged accomplice was admitted under a Georgia statute which permitted admission of such statements during the concealment phase of a conspiracy. The Supreme Court held that admission of the statement did not violate Evans' right of confrontation because the statement bore traditional indicia of reliability[7] and was neither crucial nor devastating.

We construe *Dutton* as requiring a case-by-case analysis in determining whether the application of an exception to the hearsay rule complies with the confrontation clause.

The relevant factual inquiry is whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration.

---

4. We note that the trial judge failed to proffer a limiting instruction admonishing the jury that the extra-judicial statements were to be considered only if the defendants' participation in the scheme was established by independent evidence. Under different circumstances this might be troublesome. *See United States v. Apollo,* 476 F.2d 156, 163 (5th Cir. 1973). Here, however, none of the defendants requested such an instruction. In view of the conclusive independent proof of each defendant's involvement in the concert of action, we cannot say that the failure to so instruct constituted plain error. *See United States v. Moore,* 505 F.2d 620, 624 (5th Cir. 1974), *cert. denied,* 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975).

5. In *Bruton,* the Court stated:
   We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, the problem arising only because the statement was admissible against the declarant Evans. There is not before us, therefore, any recognized exception to the hear-

say rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause. (Citations omitted.)
391 U.S. at 128 n. 3, 88 S.Ct. at 1623.

6. *See United States v. Leonard,* 161 U.S.App. D.C. 36, 494 F.2d 955, 969 (1974); *United States v. Clayton,* 450 F.2d 16, 20 (1st Cir. 1971), *cert. denied,* 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972); *United States v. Weber,* 437 F.2d 327, 338–339 (3d Cir. 1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1972); *Glinsey v. Parker,* 491 F.2d 337, 341 (6th Cir.), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2630, 41 L.Ed.2d 227 (1974); *United States v. Cogwell,* 486 F.2d 823, 834 (7th Cir. 1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974); *United States v. Everidge,* 488 F.2d 1, 3 (9th Cir. 1973).

7. In this case the statement was both spontaneous and against the declarant's penal interest.

*United States v. Adams,* 446 F.2d 681, 683 (9th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971); *see also, Dutton v. Evans, supra,* 400 U.S. at 89, 91 S.Ct. 210; *United States v. Baxter,* 492 F.2d 150, 177 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

◼ Here, under the standard enunciated above, the admission of Kelley's statement did not violate Wilson's right of confrontation. Kelley's statement was certainly a declaration against his penal interest; it implicated him in a scheme to rob a bank in violation of federal law. This factor has been traditionally viewed as sufficient to permit the use of such a statement. *Dutton v. Evans, supra,* 400 U.S. at 89, 91 S.Ct. 210; *United States v. D'Amato,* 493 F.2d 359, 365 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974).

Furthermore, Kelley was familiar with the identities and roles of the other participants. He and Wilson initiated the scheme. He induced Roberson and Hemphill to become involved, and, he urged Roberson to seek the participation of Rose. The possibility that Kelley's statement was based on faulty recollection is remote. The statement was made on January 9. On the same day, Kelley had accompanied Wilson to Cason's residence in Moberly.

Furthermore, the out-of-court statement was unambiguous.[8] The course of subsequent events indicates that Kelley's statement was accurate as to the existence of an unlawful plan and Wilson's participation in the plan. Indeed, the reliability of the statement was bolstered by a substantial amount of corroborative evidence, which, alone, virtually compelled a jury verdict of guilty against Wilson. *See United States v. Arias-Diaz,* 497 F.2d 165, 171 (5th Cir. 1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1446,

43 L.Ed.2d 761 (1975). These indicia of reliability satisfy us that the possibility Kelley's statement could have been discredited on cross-examination was wholly unreal. *Dutton v. Evans, supra,* 400 U.S. at 89, 91 S.Ct. 210.

Moreover, Kelley's statement, although damaging, was not crucial or devastating to Wilson's case. The statement was not essential to the government's case; it did not serve to make an otherwise weak case strong. *See United States v. Puco,* 476 F.2d 1099, 1104 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). In view of the overwhelming evidence of Wilson's participation in the scheme, discussed *supra,* Kelley's statement was " . . . of peripheral significance at most." *Dutton v. Evans, supra,* 400 U.S. at 87, 91 S.Ct. 210.

## III. SUFFICIENCY OF THE EVIDENCE.

◼ Defendants Simmons and Kelley argue that the evidence adduced at trial was insufficient to support the verdicts against them. Viewing the evidence most favorable to the verdict, we are satisfied that the government met its burden. The record reveals substantial evidence that Simmons and Kelley " . . . participat[ed] in the criminal act in furtherance of the common design . . . ." *United States v. Hill,* 464 F.2d 1287, 1289 (8th Cir. 1972). Roberson directly implicated both defendants. A good deal of other evidence, discussed *supra,* corroborated Roberson's testimony.

## IV. THE REMAINING CONTENTIONS

The defendants raise several other points of error. We briefly summarize the remaining contentions finding each to be without merit.

---

8. Indeed, Kelley's statement was much less ambiguous than the statement admitted in *Dutton.* There, cross-examination could have served to explain any arguable nonincriminatory meaning of the extra-judicial declaration. *Dutton v. Evans, supra,* 400 U.S. at 103–104,

91 S.Ct. 210 (Marshall, J. dissenting). That is not the case here. *See United States v. Puco,* 476 F.2d 1099, 1104 n. 8 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973).

■ Defendant Kelley argues that the trial judge erred in refusing to grant his motion for severance under Fed.R. Crim.P. 8. Considering the commonality of proofs involved, we cannot say that the trial judge abused his discretion in refusing to grant the motion. *See United States v. Scott,* 511 F.2d 15, 18 (8th Cir.), *cert. denied,* 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975).

■ Defendant Wilson urges error with respect to the failure of the government to disclose certain photographs before trial. The record indicates however that the United States Attorney promptly disclosed the photographs to Wilson's attorney when he became aware of their existence. Thus the government clearly complied with Fed.R.Crim.P. 16(c). In any case Wilson was not prejudiced by the photographs since they constituted only cumulative proof of his guilt.

■ Wilson also argues that he was prejudiced by certain remarks made in reference to one of the photographs by the United States Attorney in closing argument. The photograph showed what appeared to be gunshot wounds in Wilson's leg. The United States Attorney stated to the jury, " . . . see if you don't see shot in his leg." In fact, no gunshot pellets were shown by the photograph to be in Wilson's leg. After viewing the photographs in question, we do not consider the argument to be prejudicial. Whether or not the shot could be seen, the pictures clearly depicted a leg which had visible wounds. In view of the other testimony, it was reasonable for the jury to assume that they were gunshot wounds.

■ Wilson also argues that the district court committed reversible error in admitting certain evidence as to his blood type. We disagree. This evidence was useful in proving a negative fact; that Wilson did not have another blood type than was found near the trash can. Furthermore, Wilson's attorney neutralized the impact by establishing on cross-examination that Wilson's blood type is very common among the male popula-

tion. Even assuming, *arguendo,* that the evidence was not properly admissible, Wilson was in no way prejudiced by its admission.

The judgments of conviction are affirmed as to each of the three defendants.