UNITED STATES of America, Appellee,

v.

**Donald Laverne CARLSON, Appellant.**

UNITED STATES of America, Appellee,

v.

**Gary Clarend HOFSTAD, Appellant.**

**Nos. 76–1363, 76–1395.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 16, 1976.

Decided Dec. 17, 1976.

Rehearing and Rehearing En Banc Denied in No. 76–1363 Jan. 18, 1977.

**1351**

Neal J. Shapiro, Minneapolis, Minn., for appellant Carlson in No. 76–1363; Wesley Anderson, St. Paul, Minn., on brief.

Mark W. Peterson, St. Paul, Minn., made argument for appellant, Hofstad in No. 76–1395; Bailey W. Blethen, St. Paul, Minn., on brief.

Mel I. Dickstein, Asst. U. S. Atty., Minneapolis, Minn., for appellee United States; Robert G. Renner, U. S. Atty., Minneapolis, Minn., on brief.

Before GIBSON, Chief Judge, MARKEY* and STEPHENSON, Circuit Judge.

GIBSON, Chief Judge.

Defendants, Donald Carlson and Gary Hofstad, appeal their convictions on three counts of violating 21 U.S.C. § 841(a)(1) (1970). Carlson, Hofstad and their co-defendant, Wayne Dahl, were charged in a five-count indictment of participating in a cocaine distribution scheme. Count I of the indictment charged Carlson with distributing cocaine on July 25, 1975. Count II charged Dahl with distributing cocaine on August 8, 1975. All three defendants were charged in Count III with distributing cocaine on August 13, 1975, and in Count IV with possessing cocaine with intent to distribute on August 29, 1975. Finally, Count V charged Carlson, Hofstad and Dahl with conspiring to distribute cocaine from August 13, 1975, to August 29, 1975. Pursuant

to pretrial motions for severance, the District Court[1] severed Counts I[2] and II and the case proceeded to trial on the remaining three counts. All three defendants were convicted upon a jury verdict on these counts. Carlson was sentenced to seven years on each count to run concurrently and Hofstad was given a four-year concurrent sentence on each count. Both were given a concurrent three-year special parole term on each count. Dahl did not appeal his conviction.

■ We will recite the relevant facts as adduced at trial. The evidence must, of course, be viewed in the light most favorable to the Government as the prevailing party. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The critical evidence in this case is derived generally from activities and conversations taking place on three days in 1975—August 8, August 13 and August 29.

On August 8, 1975, Agent Donald Nelson of the Drug Enforcement Administration (DEA) met with Dahl in Minneapolis, Minnesota, for the purpose of purchasing a quantity of cocaine. At the meeting, when Agent Nelson presented $1,150 to Dahl, Dahl stated that he would procure the cocaine from his source in a leather shop. The record shows that an individual named James Tindall owned a leather shop and had purchased cocaine from Carlson in the first part of August. Tindall had in turn distributed this cocaine to Dahl in early August. The jury could reasonably infer that Dahl went to Tindall's leather shop on August 8, secured a quantity of cocaine that Tindall had previously purchased from Carlson and returned to the site where Agent Nelson was waiting. The sale was then consummated.

On August 13, 1975, Agent Nelson arranged for a purchase of two ounces of cocaine from Dahl. In making the arrange-

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. The Honorable Earl R. Larson, United States District Judge for the District of Minnesota.

2. According to the appellate record, it appears that the charge against Carlson in Count I has been dismissed.

ments, Dahl stated that "his man would be close by, but not with him" during this second transaction. Dahl later arrived at the scene of the purchase in a Cadillac being driven by Hofstad. Dahl approached Agent Nelson and was shown $3,000. Dahl then stated that "he and his man would go at that time to get the two ounces of cocaine." Dahl returned to the Cadillac and he and Hofstad drove directly to Carlson's place of business. Carlson, Hofstad and Dahl retreated into a nonpublic warehouse area of the building. As Dahl and Hofstad were leaving the building, Carlson was asked if he would be there when Hofstad returned. Carlson replied that he certainly would be there. Dahl and Hofstad then drove directly to the area where Agent Nelson was waiting. The cocaine was produced and the exchange made. Dahl accepted the money and returned with Hofstad to Carlson's place of business. Dahl was seen giving the money to Hofstad as they both entered Carlson's building. Carlson, Dahl and Hofstad again retired to the warehouse area. Soon thereafter, Dahl and Hofstad departed. A few days later, Dahl admitted to DEA Agent Ronald Tomcik that the person who accompanied him during the August 13 sale was his "connection" for cocaine. That person was Hofstad.

On August 29, Dahl met with Agent Tomcik and informed him that one pound of cocaine was available for sale. Dahl stated that he had a "connection" who "goes by the name of Pat on the street." It is undisputed that Carlson's common nickname is "Pat". Dahl and Agent Tomcik agreed on the price of $22,000 for the cocaine and agreed to complete the sale later that day at a local Holiday Inn motel. After making these arrangements, Dahl and Hofstad were observed at the Neighborhood Periodicals Club, an enterprise owned by Hofstad. Surveillance was established and Dahl was seen exiting the building. He looked at his watch and appeared to be watching or waiting for someone. Ten minutes later, Carlson arrived at the Neighborhood Periodicals Club and entered the building. Dahl and Hofstad left a few minutes later and drove to Carlson's place of

business. They then returned to the Neighborhood Periodicals Club. Fifteen minutes later, Dahl again came out of the building, walked to the corner, looked around and waved to Hofstad to follow. As they began to drive away, Hofstad stopped the car and looked around. They then proceeded to the Holiday Inn where Dahl left the car to meet with Agent Tomcik. When Dahl presented the cocaine for the sale, he was arrested. Hofstad was arrested shortly thereafter. Carlson returned to the Neighborhood Periodicals Club at 5:15 p. m. and remained there until 6:30 p. m. As he was leaving, he was arrested.

I.

The most crucial question raised on this appeal involves the propriety of admitting the grand jury testimony of James Tindall in evidence at trial. A recitation of the events leading up the admission of this testimony is necessary to achieve a proper perspective of this issue.

Tindall testified before the grand jury which was investigating various narcotics violations involving Carlson and other individuals. Tindall stated to the grand jury that he had purchased cocaine from Carlson on two occasions in early August, 1975, and that some of this cocaine had in turn been distributed to Dahl. The Government's proof at trial inferentially showed that this cocaine received by Tindall was the same cocaine sold to Agent Nelson in the cocaine transaction of August 8, 1975. The Government intended to call Tindall as a witness at trial to testify in line with his grand jury testimony.

However, on March 15, 1975, the evening before the commencement of the trial in this case, Tindall advised a DEA agent, John O'Connor, that he did not desire to testify at trial because he feared reprisals. When Agent O'Connor questioned Tindall about specific threats, Tindall responded equivocally. O'Connor reminded Tindall of the grand jury testimony and told Tindall that even though Carlson was aware of that testimony Tindall had not suffered any harm from Carlson. Tindall stated: "Yes, I

know, but if I don't testify at trial at least I'll have a chance. If I do, it will be over for me." When Tindall continued to evade any questions as to the source of the threats, Agent O'Connor inquired: "Do you realize that in refusing to discuss this particular topic with me you are in essence confirming the fact that you received threats from Carlson?" Tindall responded: "I know. You have got the message." On the following day in the presence of Tindall's attorney, the Government verified that Tindall would not testify at trial. When asked if he had deliberately lied to the Government, Tindall stated that he had always been truthful with the Government and before the grand jury. Further, in a conversation with Agent Nelson, Tindall said he did not want to discuss the reason for his not testifying. In response to Nelson's inquiry as to whether Tindall thought that Carlson would kill him if he were to testify, Tindall stated that "he did not want to have to find out."

The next day, March 17, 1975, Tindall was called as a witness at trial outside of the presence of the jury and he informed the court that he would refuse to testify on Fifth Amendment grounds. The prosecutor informed Tindall and the court that he had received authorization to grant Tindall use immunity from his trial testimony. After consulting with his attorney, Tindall again refused to testify, was held in contempt of court and was sentenced to six months imprisonment. The Government then offered in evidence the grand jury testimony of Tindall. The District Court heard testimony from DEA Agents O'Connor and Nelson to determine why Tindall refused to testify and whether the grand jury testimony should be admitted. After hearing evidence which was highly suggestive of threats and intimidating overtures directed toward Tindall by Carlson, the District Court concluded that the grand jury testimony should be admitted. The District Court also ruled that Carlson was a danger

to witnesses in the case and revoked his bond. The court ruled that Tindall was "unavailable" as a witness and, in a post-trial hearing in which some conflicting evidence was heard on this subject, the court explicated this ruling: "Well, I am convinced * * * as I said before that Mr. Carlson made Mr. Tindall unavailable for trial. I think this is clear."

■ At the outset we accept, based upon the District Court's findings and the evidence adduced in the trial court proceedings, that Tindall refused to testify because of threats directed against him by Carlson. From this premise, we proceed to determine whether Tindall's grand jury testimony was properly admitted in light of existing evidentiary and constitutional principles.

■ A. *Law of Evidence.* The District Court ruled that Tindall's grand jury testimony, which was clearly hearsay, was admissible pursuant to Fed.R.Ev. 804(b)(5). Rule 804 sets out those instances in which the hearsay statements of unavailable declarants may be admitted in evidence at trial. The rule prescribes four specific and traditional exceptions to the hearsay rule and then formulates a new "trustworthiness" exception in Rule 804(b)(5).[3] That subsection provides:

(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(5) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of

---

**3.** An identical provision is embodied in Rule 803(24) which permits the admission of certain trustworthy hearsay statements when the declarant is available to testify at trial. Basically,

the same standards and evidentiary principles apply under Rule 803(24) and Rule 804(b)(5). 4 J. Weinstein, *Evidence* ¶ 804(b)(5)[01] (1975).

the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

■ Preliminarily, there can be no dispute that Tindall was in fact unavailable at the time he was called to testify at trial. Fed.R.Ev. 804(a)(2) provides that a declarant is "unavailable" if he "persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so * * *." Here, Tindall's obstinate refusal to testify despite the granting of use immunity and a court order rendered him "unavailable". C. McCormick, *Law of Evidence* 612 (2d ed. 1972).

■ The statement sought to be admitted under Rule 804(b)(5) must have "circumstantial guarantees of trustworthiness" equivalent to those inherent in the other four exceptions of Rule 804(b). In assessing the qualitative degree of trustworthiness of a particular statement, courts should inquire into the reliability of and necessity for the statement. *See* 4 J. Weinstein, *Evidence* ¶ 803(24)[01] (1975); *cf. Chestnut v. Ford Motor Co.,* 445 F.2d 967, 972 n. 5 (4th Cir. 1971). There is a strong indication of reliability in Tindall's testimony. His statements were made under oath and any misrepresentation or deliberate falsehood might subject Tindall to the sanctions of perjury. Tindall was relating facts surrounding a cocaine transaction in which he participated [4] and of which he possessed firsthand knowledge; therefore, there was no reliance upon potentially erroneous secondary information and the possibility of

faulty recollection was minimized. Moreover, Tindall never recanted his grand jury testimony or expressed any belated reservations as to its accuracy. Rather, he specifically stated at the time of trial that he told the truth to the grand jury. Tindall's testimony was not only reliable, but there was also a substantial need for it at trial since Tindall was unavailable at trial, *see* 4 J. Weinstein, *Evidence, supra* at ¶ 804(b)(5)[01], and there were no other individuals to the Government's knowledge who could testify as to the Carlson-Tindall cocaine transaction. *See Workman v. Cleveland-Cliffs Iron Co.,* 68 F.R.D. 562 (N.D.Ohio 1975). Therefore, the District Court, which has a wide latitude of discretion in determining the trustworthiness of a statement, did not err in finding Tindall's testimony to be trustworthy within the meaning of Rule 804(b)(5).

■ To be admissible under Rule 804(b)(5), the statement must also be offered as evidence of a material fact. This element is satisfied in the present case. The Government was obligated to prove that Carlson intentionally participated in the distribution of cocaine and the conspiracy to distribute cocaine. Tindall's testimony implicated Carlson in a cocaine transaction occurring just six days before the cocaine transaction charged in the distribution count against Carlson and the commencement of the conspiratorial scheme charged in the conspiracy count. The Tindall testimony was relevant and material in that it showed intent, knowledge, a common plan or scheme and the absence of mistake or accident. *United States v. Wixom,* 529 F.2d 217, 220 (8th Cir. 1976); *United States v. Conley,* 523 F.2d 650, 653 (8th Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976); *United States v. Lewis,* 423 F.2d 457, 459 (8th Cir.), *cert. denied,* 400 U.S. 905, 91 S.Ct. 146, 27 L.Ed.2d 142 (1970); Fed.R.Ev. 404(b).[5]

---

**4.** The District Court intimated that Tindall's grand jury testimony might be admissible under Fed.R.Ev. 804(b)(3) as a statement against penal interest. That rule requires the existence of "corroborating circumstances" which are supportive of the trustworthiness of the statement. In light of our conclusion that Tindall's grand jury testimony was properly admitted

under Rule 804(b)(5), we do not address the question of whether the admission is sustainable under Rule 804(b)(3).

**5.** Our holding on this point forecloses Carlson's claim that the admission of Tindall's testimony was impermissible under Fed.R.Ev. 404(b) as evidence of other crimes. As noted, the testi-

The requirement in Rule 804(b)(5) that the statement be more probative than any other evidence which could be procured through reasonable efforts is likewise satisfied here. Tindall's testimony was clearly material to the issues raised at trial and there is no indication in the record that the Government could have obtained the same or similar evidence involving the Carlson-Tindall transaction from another source. Furthermore, the interests of justice were advanced, as Rule 804(b)(5) mandates, by the admission in evidence of the Tindall testimony. The statements were made under oath and possessed a high degree of trustworthiness. To deprive the jury of the substance of this testimony merely because Carlson caused Tindall not to testify at trial would be antithetical to the truth-seeking function of our judicial system and would not serve the interests of justice.

Finally, Rule 804(b)(5) requires that notice be given to the adverse party prior to the trial or hearing to inform him that the hearsay statement will be used at trial. Undeniably, no such formal pretrial notice was given to Carlson in the present case. However, this notice requirement should not be an inflexible and imposing barrier to the admissibility of probative evidence when the peculiar circumstances of a case militate against its invocation. Here, Carlson was acutely aware of the substance of Tindall's damaging grand jury testimony. The Government was not informed until the eve of trial that Tindall might not testify and it was only when Tindall disobeyed a court order to testify and was held in contempt that the Government knew that Tindall would not testify at trial under any circumstances. The purpose of the notice requirement is to give the adverse party an adequate opportunity to prepare to contest the use of the statement. H.Conf. Rep. No. 93–1597, 93d Cong., 2d Sess.— (1974), *reprinted in* 4 U.S.Code Cong. & Admin.News, p. 7106 (1974). Carlson was supplied with copies of Tindall's grand jury

testimony under the Jencks Act two days before the admission of the testimony in evidence. The Government advised Carlson of its intent to offer the testimony in evidence immediately after it became obvious that Tindall would not testify. Based upon this late and unexpected development that Tindall would not be available to testify at trial, it was excusable for the Government not to give formal pretrial notice. Notice during trial is permissible on occasion, *United States v. Iaconetti*, 406 F.Supp. 554, 559–60 (E.D.N.Y.1976), and Carlson could have sought a continuance if he felt that he was not prepared to rebut the Tindall testimony or contest its use at trial. *See United States v. Iaconetti, supra* at 559–60; 4 J. Weinstein, *Evidence, supra* at ¶ 803(24)[01]. In any event, as the need for the grand jury testimony arose due to Carlson's own wrongdoing and as Carlson was provided a copy of the grand jury testimony two days before it was admitted at trial, Carlson was not prejudiced by the lack of any formal notice.

We conclude that the District Court's admission of Tindall's grand jury testimony under Fed.R.Ev. 804(b)(5) was not an abuse of discretion. We now turn to the question of whether the admission violated Carlson's Sixth Amendment right of confrontation.

B. *Constitutional Right of Confrontation.* The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." The confrontation clause, in its literal construction, ensures that the witnesses against the accused will testify under oath at trial where they are subject to cross-examination and where the jury can observe their demeanor. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). However, it is not always possible to summon witnesses for a personal appearance at trial. If an unavail-

---

mony fits within a number of exceptions to the general rule of exclusion contained in Rule 404(b). Furthermore, this relevant evidence was clear and convincing and its probative val-

ue outweighed any probable general prejudicial impact. *See United States v. Clemons*, 503 F.2d 486, 489 (8th Cir. 1974).

able witness has made an extrajudicial statement which is inculpatory as to the accused, the Government generally will attempt to present this statement to the jury through alternate means. The means commonly utilized to allow admission of such a statement is through some recognized exception to the hearsay rule which dispenses with the need to bring the unavailable declarant to trial as a condition precedent to the admission of the statement. It is this apparent conflict between the accused's right to confront adverse witnesses and the admission of out-of-court hearsay declarations pursuant to an exception to the hearsay rule which has generated the bulk of litigation under the confrontation clause.

While the confrontation clause and the hearsay rule "stem from the same roots", the Supreme Court has never identified the two as congruent. *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). However, courts have shown a propensity to rule that the admission of out-of-court statements under an exception to the hearsay rule does not violate the confrontation rights of the accused. As Judge Medina stated in *United States v. Kelly*, 349 F.2d 720, 770 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966): "The application of * * * virtually all the exceptions to the hearsay rule, does not involve any deprivation of the right of confrontation as the Sixth Amendment has been interpreted and construed." Accordingly, existing decisional authority recognizes that the accused's right of confrontation is not violated by the admission of hearsay statements as dying declarations,[6] prior recorded testimony of an unavailable witness,[7] a declaration by a co-conspirator in furtherance of the conspiracy,[8] recorded past recollection[9] and spontaneous exclamations.[10] On the contrary, there are rare occasions when the proper admission of an out-of-court statement under an exception to the hearsay rule may run afoul of the confrontation clause. *Phillips v. Neil*, 452 F.2d 337, 345 (6th Cir. 1971), *cert. denied*, 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (1972); *see California v. Green, supra*, 399 U.S. at 155–56, 90 S.Ct. 1930.

Tindall's grand jury testimony in this case was, as we have indicated, properly admitted under an exception to the hearsay rule. However, the exception applicable in this case is not one of the traditional common law exceptions to the hearsay rule, 5 J. Wigmore, *Evidence* § 1426 (3d ed. 1940), but rather is the modern and general "trustworthiness" exception contained in Fed.R.Ev. 804(b)(5). The testimony was admitted as substantive evidence bearing directly on Carlson's guilt and Carlson was not presented with the opportunity at any time to cross-examine Tindall.

The fact that a defendant is unable to cross-examine the declarant is not always controlling on the confrontation issue since the right of cross-examination is not absolute. *United States v. Cogwell*, 486

---

6. *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) is generally cited in support of the proposition that admission of dying declarations does not violate the confrontation clause. In *Mattox*, the dying declaration was offered by the defendant himself and, thus, no confrontation issue was presented. Regardless, the Supreme Court has stated in later cases that admission of dying declarations does not impinge upon any confrontation values. *Pointer v. Texas*, 380 U.S. 400, 407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Kirby v. United States*, 174 U.S. 47, 61, 19 S.Ct. 574, 43 L.Ed. 890 (1899).

7. *Mancusi v. Stubbs*, 408 U.S. 204, 216, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

8. *United States v. Kelley*, 526 F.2d 615, 620–21 (8th Cir. 1975), *cert. denied*, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976); *United States v. Snow*, 521 F.2d 730, 734–36 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976), *see Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

9. *United States v. Kelly*, 349 F.2d 720, 770 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966).

10. *McLaughlin v. Vinzant*, 522 F.2d 448, 450–51 (1st Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975).

F.2d 823, 834 (7th Cir. 1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974). While the right to confront witnesses personally, embracing also the right to cross-examine adverse witnesses, has a high priority on our constitutional scale, it is subject to certain exceptions embodied in the hearsay rule, which was embedded in our law at the time the Constitution was adopted. The hearsay rule has an impressive predicate of support and a long history of acceptance based on attributes deemed essential to the administration of justice. The hearsay rule and its exceptions are deeply ingrained in our substantive law of evidence. However, as previously stated, the right of confrontation is not synonymous with the hearsay rule. This point is made clear by Mr. Justice Stewart in *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970), where he states:

> There was not before us in *Bruton* [*v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] "any recognized exception to the hearsay rule," and the Court was careful to emphasize that "we intimate no view whatever that such exceptions [to the hearsay rule] necessarily raise questions under the Confrontation Clause." 391 U.S., at 128 n. 3, 88 S.Ct. [1620], at 1624.

In circumstances where the declarant is not available for cross-examination and his out-of-court statement is offered as an exception to the hearsay rule, courts are to engage in a case-by-case analysis to determine whether the right of confrontation of the accused is violated. *Dutton v. Evans, supra* at 86, 91 S.Ct. 210. The test under *Dutton v. Evans, supra,* as elucidated in *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972) is as follows:

> The focus of the Court's concern has been to insure that there "are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant," *Dutton v. Evans, supra* [400 U.S.], at 89 [91 S.Ct. [210] at 220], 27 L.Ed.2d 213, and to "afford the trier of fact a satisfactory basis for evaluating the truth

of the prior statement," *California v. Green, supra,* 399 U.S. at 161 [90 S.Ct. [1930] at 1936]. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these "indicia of reliability" referred to in *Dutton.*

Leaving aside for the moment the reason why Tindall was unavailable for trial, we have not been cited to nor have we found any case in which an unavailable witness's grand jury testimony was admitted as substantive evidence at trial to reflect on defendant's guilt. Although, as we have indicated, the grand jury testimony of Tindall bore "circumstantial guarantees of trustworthiness" under Rule 804(b)(5), the testimony must also carry the constitutionally required "indicia of reliability" identified in *Dutton v. Evans, supra* at 88–89, 91 S.Ct. 210, in order to avoid any infringement on the accused's confrontation rights. Sanctioning the use of grand jury testimony under these circumstances at trial may have wide ramifications in the criminal justice system. Since the contours of the confrontation clause are not clearly delineated at this point, *compare Dutton v. Evans, supra* (indicia of reliability are of primary significance), *with Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (prior recorded testimony can not be admitted unless accused was offered previous opportunity to cross-examine witness), we deem it prudent to withhold a definitive ruling on this far-reaching and sensitive issue at the present time. We choose to simply assume, for purposes of this case, that Carlson's right of confrontation was invoked by the admission of the grand jury testimony. We now proceed to discuss whether Carlson waived his confrontation rights.

The Sixth Amendment right of confrontation is, by its language and historical underpinnings, a personal right of the accused and is intended for his benefit. *Cf. Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). As such, this right, like other federally guaranteed constitutional rights, can be waived by the

accused. *Brookhart v. Janis*, 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); 5 J. Wigmore, *Evidence, supra* § 1398, at 142–43. To constitute a valid waiver there must be "an intentional relinquishment or abandonment of a known right or privilege" by the accused. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

 A waiver of the right of confrontation can take various forms. In some instances, an accused may voluntarily consent to forego his right of confrontation. For example, the accused may agree not to cross-examine witnesses at his trial. *See Brookhart v. Janis, supra.* By stipulating to the admission of evidence, the defendant waives the right to confront the source of the evidence. *United States v. Martin*, 489 F.2d 674, 678 (9th Cir. 1973), *cert. denied*, 417 U.S. 948, 94 S.Ct. 3073, 41 L.Ed.2d 668 (1974); *see Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); *Diaz v. United States*, 223 U.S. 442, 451, 32 S.Ct. 250, 56 L.Ed. 500 (1912). The accused also waives his right of confrontation by entering a guilty plea. *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

In the present case, Carlson did not explicitly manifest his consent to a waiver of his confrontation rights. Rather, when he learned that Tindall was going to testify at his trial, he intimidated Tindall into not testifying and, thus, created a situation in which the Government's only means of placing before the jury the relevant and probative testimony of Tindall was by offering the grand jury testimony in evidence. Whether the accused waives his right of confrontation under these circumstances is an issue which apparently has not been directly considered by a federal court or, so far as we have been able to ascertain, by any state court. However, there are indications from various sources that the accused does waive his right of confrontation by pursuing this course of conduct, which is itself inimical to the administration of justice.

 The Supreme Court has recognized that the right of confrontation may be lost not only by consent, but "at times even by misconduct." *Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934). If a defendant voluntarily absents himself from his trial, he has waived his confrontation rights. *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973); *Diaz v. United States, supra*, 223 U.S. at 455, 32 S.Ct. 250. Moreover, disruptive and contumacious conduct by an accused at trial may justify his removal from the courtroom and effectively constitute a waiver of the right of confrontation. *Illinois v. Allen*, 397 U.S. 337, 342–43, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).[11] In *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), the Court ruled that an accused's right of confrontation is violated if the prosecutor, in light of a witness's invocation of the privilege against self-incrimination, examines that witness in a manner which allows the prosecutor to place before the jury a confession of the witness implicating the accused. However, if the witness's refusal to testify was procured by the accused, no confrontation rights are denied. *United States v. Mayes*, 512 F.2d 637, 648–51 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670

11. When an accused is absent from his trial either voluntarily, *Taylor v. United States, supra*, or because he forfeited his right to be present by his misconduct, *Illinois v. Allen, supra*, his counsel is still available to cross-examine adverse witnesses and to protect the accused. If a defendant is deemed to have waived his confrontation rights by causing a Government witness not to testify, as in the present case, neither he nor his counsel has the opportunity to cross-examine the witness. We do not deem this distinction to be of constitutional significance. Since confrontation is a right which is personal to the accused, *Faretta v. California, supra*, 422 U.S. at 819, 95 S.Ct. 2525, the question in all waiver cases is whether the defendant forfeited his right to confront his accusers personally. The Supreme Court ruled that the defendants' conduct in *Taylor* and *Allen* amounted to such a waiver and no significance was placed on the fact that the defendants maintained the right to confront witnesses vicariously through counsel.

(1975); *cf. Douglas v. Alabama, supra,* 380 U.S. at 420, 85 S.Ct. 1074.

The Sixth Amendment does not stand as a shield to protect the accused from his own misconduct or chicanery. *Diaz v. United States, supra,* 223 U.S. at 458, 32 S.Ct. 250; *Reynolds v. United States,* 98 U.S. 145, 159, 25 L.Ed. 244 (1878); [12] 5 J. Wigmore, *Evidence, supra* at § 1405(4). "A defendant who murders a witness ought not be permitted to invoke the right of confrontation to prohibit the use of his accusation." Graham, *The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One,* 8 Crim. L.Bull. 99, 139 (1972). Similarly, a defendant should not be afforded the protection of the confrontation clause if he achieves his objective of silencing a witness by less drastic, but equally effective, means. Carlson would have been able to confront Tindall at trial had he not taken steps to assure Tindall's "unavailability" at trial. "[The defendant] cannot now be heard to complain that he was denied the right of cross-examination and confrontation when he himself was the instrument of the denial." *United States v. Mayes, supra,* 512 F.2d at 651.

Naturally, considerations of public policy and effective administration of justice enter into the resolution of issues of this type. The law will not place its imprimatur on the practice of threatening Government witnesses into not testifying at trial and courts should not permit the accused to derive any direct or tangential benefit from such conduct.[13] In discussing the confrontation clause in *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895), the Supreme Court stated that "general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case." In *Diaz v. United States, supra,* 223 U.S. at 458, 32 S.Ct. at 255, the Court quoted with approval the following language from *Falk v. United States,* 15 App.D.C. 446, 460, cert. denied, 181 U.S. 618, 21 S.Ct. 923, 45 L.Ed. 1030 (1901):

> The question is one of broad public policy, whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries, and turn them into a solemn farce, and ultimately compel society, for its own safety, to restrict the operation of the principle of personal liberty. Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong.

Nor should the law permit an accused to subvert a criminal prosecution by causing witnesses not to testify at trial who have, at the pretrial stage, disclosed information which is inculpatory as to the accused. To permit the defendant to profit from such conduct would be contrary to public policy, common sense and the underlying purpose of the confrontation clause. As Justice Cardozo stated in *Snyder v. Massachusetts,*

---

**12.** In *Reynolds,* the defendant wrongfully procured the absence of a Government witness from his trial. The Court ruled that the defendant, by his misconduct, had rendered the witness "unavailable" for trial and, thus, that witness's prior recorded testimony was admissible in defendant's trial. In that case, defendant was afforded the opportunity to cross-examine the witness at the time the prior testimony was recorded. In the present case, Carlson was not able to cross-examine Tindall at any time. To that extent, this case presents a more difficult question than *Reynolds.* However, by focusing on the defendant's conduct in each of these cases, there is a similarity and we are guided by the precept articulated in *Reynolds* that "no one shall be permitted to take advantage of his own wrong * * *." 98 U.S. at 159, 25 L.Ed. 244.

**13.** Congress has embodied the public policy against obstructing or attempting to obstruct justice into 18 U.S.C. § 1503 (Supp. V, 1975), which proscribes the directing of threats against witnesses or otherwise impeding the administration of justice. As the maximum imprisonment under § 1503 is five years, that statute is not an effective deterrent to a defendant predisposed to such conduct if the defendant is on trial for a crime carrying more extreme punitive sanctions.

291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934):

> But justice, though due the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.

We conclude that under the circumstances of this case, Carlson waived his right to confront Tindall and, accordingly, no constitutional error resulted from the admission of Tindall's grand jury testimony.[14] The fact that Carlson was not explicitly advised of his right of confrontation preceding this waiver is of no moment since the controlling issue is whether the waiver was voluntary. *Taylor v. United States*, 414 U.S. 17, 19–20, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973). We hold that Carlson voluntarily waived his right of confrontation.

## II.

Carlson contends that there is an insufficient evidentiary basis to support his conviction. In analyzing this contention, we are guided by the general rule that "it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt but simply that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *United States v. Shahane*, 517 F.2d 1173, 1177 (8th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). This standard also applies in cases where the conviction rests solely on circumstantial evidence, *see United States v. Joyner*, 539 F.2d 1162, 1165 (8th Cir. 1976), since circumstantial evidence is intrinsically as probative as direct evidence. *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *see United States v. Diggs*, 527 F.2d 509, 512 (8th Cir. 1975). The Government is to be accorded all reasonable inferences which might be derived from the evidence.

*United States v. Joyner, supra* at 1165. With these principles in mind, we must determine whether the evidence against Carlson is legally sufficient to support his conviction.

The facts of this case have already been recited and we will not repeat them in detail at this point. In general, the jury could reasonably have concluded that Carlson distributed to Tindall a quantity of cocaine which was immediately sold to Dahl and which became the subject of the cocaine transaction on August 8, 1975. The events of August 13, 1975, are highly implicative of Carlson's involvement in the conspiracy to distribute cocaine. After Dahl made arrangements for the sale of cocaine to Agent Nelson, Dahl stated that he would go to pick up the cocaine. He and Hofstad drove directly to Carlson's place of business where they went into a nonpublic warehouse area. The jury could have inferred that Carlson was aware of the impending sale since he assured Hofstad that he would be in the building when Hofstad and Dahl returned. Hofstad and Dahl drove directly back to the site of the cocaine sale and produced the cocaine. They returned immediately after receiving the money from the cocaine sale and the three of them went directly to the warehouse area. It is not unreasonable to conclude, as the jury apparently did, that Carlson was aware of the cocaine distribution scheme and voluntarily participated in it. Finally, under the facts of this case, the jury could likewise conclude that, when Dahl stated that his "connection" was named "Pat", he was referring to Carlson.

It is true, as Carlson argues, that the Government was not able to establish by direct evidence that Carlson supplied cocaine to Hofstad and Dahl. However, there is substantial evidence in the record

**14.** We need not go so far in this case as to hold that, when an accused threatens a potential witness into not testifying at trial, all extrajudicial statements of that witness, however unreliable or unbelievable, may be admitted in evidence at trial. Elements of due process under the Fifth Amendment may enter into the analysis if the fairness of the trial is sacrificed.

Here, Tindall's statements were made under oath and possess guarantees of trustworthiness. Tindall never recanted this testimony, but rather reaffirmed it as true at the time of trial. Therefore, the testimony was properly admitted and no due process rights were infringed.

to show that Dahl and Hofstad engaged in a conspiracy to sell cocaine.

> [O]nce the government has established the existence of a conspiracy, even slight evidence connecting a particular defendant to the conspiracy may be substantial and therefore sufficient proof of the defendant's involvement in the scheme.

*United States v. Overshon*, 494 F.2d 894, 896 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). We believe that the evidence in this case, albeit circumstantial, is sufficient to have convinced the jury beyond a reasonable doubt that Carlson was guilty of participating in a conspiracy to distribute cocaine.

▮ Carlson relies on *United States v. Frol*, 518 F.2d 1134 (8th Cir. 1975), in support of his position on this issue. *Frol* is factually distinguishable from the present case. In *Frol*, a prosecution for possessing heroin with intent to deliver, the defendant was identified as a source of heroin and was allegedly the driver of an automobile from which a supply of heroin was secured. Because of inadequate surveillance, the court stated that the jury could only speculate that the defendant was in that particular automobile, 518 F.2d at 1137, and there was no independent evidence showing that the defendant was engaged in a joint venture to distribute heroin. In this case, the jury was apprised of not one, but three, transactions from which it could have concluded that Carlson was involved in the distribution of cocaine. There was no breakdown in surveillance similar to that in *Frol* since Carlson was identified and evidence of his activities was placed before the jury. The circumstantial evidence showing Carlson's participation in the conspiracy is stronger than that in *Frol*.[15]

▮ We hold that there is sufficient evidence to support Carlson's conviction on Count V of conspiring to distribute cocaine. Furthermore, the evidence surrounding Carlson's activities on August 13, 1975, is sufficient to support the Count III conviction for unlawfully distributing cocaine on that date. Carlson was given concurrent sentences on Counts III, IV and V. While the evidence on the Count IV possession charge is somewhat less compelling than that supporting the other counts, we need not determine its legal sufficiency since we choose to apply the concurrent sentence doctrine. *See United States v. Darnall*, 545 F.2d 595 (8th Cir. 1976).[16]

### III.

▮ Hofstad contends that his rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), were violated when the District Court allowed Agent Nelson to testify as to certain statements made by co-defendant Dahl, who was tried jointly with Hofstad. Agent Nelson testified that Dahl had told a DEA agent that Hofstad was Dahl's connection for cocaine.

---

15. Carlson also contends that the District Court should not have admitted the out-of-court statement of Dahl identifying "Pat" as his source for cocaine. The statement was admitted under Fed.R.Ev. 801(d)(2)(E) as a statement by a co-conspirator made during the course of and in furtherance of the conspiracy. Carlson argues that the evidence here did not establish his membership in the conspiracy and, thus, Rule 801(d)(2)(E) does not apply. The record, as we have indicated, belies this contention. The Government's proof established the requisite "illicit association" between Carlson and Dahl. *United States v. Sanders*, 463 F.2d 1086, 1088 (8th Cir. 1972). Therefore, the statement was properly admitted.

16. Carlson argues on appeal that the District Court erred in overruling his pretrial motion for severance. It is undisputed that Carlson did not renew the motion at the close of the government's evidence or at the conclusion of all the evidence. We have held that if not so renewed, the motion is "deemed waived". *United States v. Porter*, 441 F.2d 1204, 1212 (8th Cir.), *cert. denied sub nom. Newland v. United States*, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971). Accordingly, we hold that Carlson has waived his right to assert the severance issue. Even if we were to review this contention under the "plain error" rule, Fed.R.Cr.P. 52(b), we would not find that the District Court's ruling "affected substantial rights resulting in a miscarriage of justice." *United States v. Big Crow*, 523 F.2d 955, 960–61 (8th Cir. 1975).

The Court in *Bruton* held that the accused's right of confrontation is abridged when the trial court permits the introduction in evidence of a confession by a jointly tried co-defendant which is inadmissible hearsay as to the accused and which implicates both the co-defendant and the accused. This court has ruled that the *Bruton* rule is not violated when the statement of the co-defendant is properly admitted as a declaration by a co-conspirator in the course of and in furtherance of the conspiracy, provided the statement has sufficient indicia of reliability and is neither crucial nor devastating. *United States v. Kelley*, 526 F.2d 615, 620–21 (8th Cir. 1975), *cert. denied*, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976). Hofstad recognizes this rule and contends only that the statement by Dahl was improperly admitted since it was not in furtherance of the conspiracy.[17] We disagree. We have previously held that statements of a co-conspirator identifying a fellow co-conspirator as his source of narcotics is in furtherance of the conspiracy. *United States v. Hutchinson*, 488 F.2d 484, 491 & n. 16 (8th Cir. 1973), *cert. denied sub nom. Ennis v. United States*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974); *see United States v. James*, 510 F.2d 546, 549–50 (5th Cir.), *cert. denied sub nom. Vasquez v. United States*, 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); *Salazar v. United States*, 405 F.2d 74 (9th Cir. 1968). Therefore, the District Court did not abuse its discretion in admitting Dahl's hearsay statement.

## IV.

■ Hofstad contends that reversible error was injected into the trial on the basis of allegedly prejudicial testimony given by Agent Nelson. On August 13, 1975, Hofstad was observed driving a dark colored Cadillac, occupied also by Dahl, to the site where the cocaine transaction was consummated with Agents Nelson and Tomcik. At

trial, the prosecutor asked Agent Nelson what he had observed during that transaction on August 13. Agent Nelson responded:

> We got out of my vehicle and we walked towards the beach and we noticed close to where I had parked our vehicle there was a dark blue or black four-door Cadillac. The Cadillac was familiar to me. Earlier in the year Special Agent David Haight had been meeting undercover with the defendant Gary Hofstad and Hofstad was driving * * *.

At that point, Hofstad's counsel moved for a mistrial. The District Court inquired of Agent Nelson whether he had personally observed the Cadillac. Agent Nelson stated: "I had followed that Cadillac or a Cadillac similar in appearance to that Cadillac." The District Court then denied the motion for a mistrial.

The District Court did not err in refusing to grant a mistrial. There is no contention or showing that the Government exercised any bad faith in eliciting this testimony. See *United States v. Scott*, 511 F.2d 15, 20 (8th Cir.), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). The passing reference did not identify Hofstad as a participant in previous criminal endeavors. Agent Nelson simply stated that a DEA agent was "meeting undercover" with Hofstad. Finally, there was substantial evidence of Hofstad's guilt before the jury and there is little likelihood that the jury was affected by this comment. *United States v. Boerner*, 508 F.2d 1064, 1068 (5th Cir.), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975).

## V.

■ Hofstad's remaining two contentions are likewise without merit. He contends that the District Court erred in admitting in evidence a "Quality Tester"

---

17. Due to the limited nature of Hofstad's argument in this regard, we need not discuss in detail whether the statement carried sufficient indicia of reliability or whether it was crucial to the Government's case. It is sufficient to note

that the statement did in fact have adequate indicia of reliability and, while damaging to Hofstad, it was not crucial or devastating. *United States v. Kelley, supra* at 620–21.

which was, according to the Government, taken from Hofstad's desk and was used as a field tester to detect the presence of cocaine. Hofstad argues that the item was irrelevant since there was an insufficient showing that it was owned or possessed by him. However, the item was found at Hofstad's place of business inside of a desk. The desk was situated in an office containing photographs of Hofstad and Hofstad's wife. There was also a plaque on the wall of the office with Hofstad's name on it. The Government presented sufficient evidence to show that the item was removed from Hofstad's desk and, thus, there is an adequate link between the tester and Hofstad. Also, Hofstad contends that the Government failed to prove that the tester could actually detect cocaine. In refutation of this contention, it is sufficient to note that the Quality Tester unit contained a set of detailed instructions on how to detect cocaine with the apparatus, a list of warnings and a disclaimer that the tester "is not intended to promote the use of the substances tested." We conclude that the Quality Tester was properly admitted in evidence.

Finally, Hofstad contends that the District Court erred in refusing to give a jury instruction offered by Hofstad. We have reviewed the instructions as a whole and find that they fully and adequately informed the jury of the relevant law. Therefore, it was not error to not give Hofstad's cumulative instruction.

The judgments of conviction against Carlson and Hofstad are affirmed.