UNITED STATES of America, Appellee,

v.

Russell Wayne BENFIELD, Appellant.

No. 78–1665.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 11, 1978.

Decided March 8, 1979.

John C. Pleban, London, ·Greenberg & Fleming, St. Louis, Mo., argued and on brief, for appellant.

David M. Rosen, Asst. U. S. Atty., St. Louis, Mo., (argued), and Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief, for appellee.

Before GIBSON, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.

GIBSON, Chief Judge.

A jury found Russell Wayne Benfield guilty of misprision of a felony in violation of 18 U.S.C. § 4[1] and acquitted him of being an accessory after the fact to kidnapping in violation of 18 U.S.C. § 3.[2] After being sentenced to prison for two years on the misprision charge, Benfield brings this appeal. We reverse and remand.

The events leading to the conviction of Benfield took place during February 1977. Prior to February 24, 1977, John Bates was an inmate at the Arizona State Penitentiary pursuant to his conviction for assault with a deadly weapon. On that date Bates broke out of the Arizona penitentiary with the assistance of his wife, Charlotte. The following day John and Charlotte Bates forcibly took Patricia Cady and her automobile from a hospital parking lot in Tucson, Arizon. The Bateses then drove the automobile, with Cady as a prisoner, to St. Louis, Missouri, where they arrived on February 27, 1977.

Prior to his arrival in St. Louis, John Bates telephoned Russell Benfield several times, both before and after kidnapping Cady. The substance of those conversations was disputed at trial. The Government's version came in through the testimony of Charlotte Bates and Patricia Cady as to what John Bates told them had been said. According to this version Bates told Benfield about the kidnapping during a phone call from Las Cruces, New Mexico, and Benfield told Bates to bring Cady to St. Louis. Benfield testified that he did not learn of the jailbreak or kidnapping until Bates arrived in Missouri.

In any event, Benfield did meet with Bates in St. Louis. Benfield rented a motel room for Bates in which Patricia Cady was held. Cady was blindfolded and only saw parts of Benfield's face and body. As in the case of the telephone conversations, the Government's version of the discussions between Benfield and John Bates was presented through Charlotte Bates's and Patricia Cady's recollections of what Bates recalled after Benfield had left. The Government presented evidence that Benfield gave John Bates sixty-six dollars, and promised to bring additional funds to him in Kennett, Missouri.

According to Benfield, once he learned of the kidnapping his efforts were directed at securing Cady's release unharmed and causing Bates to leave St. Louis. Benfield claims he told Bates he would supply money if Cady were released. Bates then agreed to release Cady in Memphis, Tennessee, and return to St. Louis for money received by Benfield from Bates's account in a Marine Corps credit union.

From St. Louis, John and Charlotte Bates took Patricia Cady to Kennett, Missouri,

---

1. 18 U.S.C. § 4 provides:
   Misprision of felony
   Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.
2. 18 U.S.C. § 3 provides:
   Accessory after the fact
   Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.
   Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by death, the accessory shall be imprisoned not more than ten years.

where John Bates met with Roger Benfield, Russell's brother, but failed to receive any aid from him. While the group was in Kennett, law enforcement officers apprehended Charlotte Bates and released Patricia Cady. John Bates took his own life. Patricia Cady then participated in a news conference and granted interviews with journalists and the broadcast media. Patricia Cady has commenced civil actions against the State of Arizona stemming from the abduction and Charlotte Bates has been convicted of aiding and abetting the kidnapping of Patricia Cady.

In a four-count indictment filed September 29, 1977, Benfield was charged with being an accessory after the fact to the kidnapping of Patricia Cady and to the interstate transportation of her stolen car and with misprision of those felonies. Trial was set for January 3, 1978, but was continued to February 27, 1978, due to the hospitalization of a Government witness, Patricia Cady. On February 23, 1978, the Government obtained a further continuance of the case to April 24, 1978, due to Cady's unavailability. In a letter dated January 30, 1978, Cady's psychiatrist, Dr. David B. Gurland, indicated that Cady should not be subpoenaed to appear for two or three months. Prior to April 24, 1978, Dr. Gurland again wrote the trial court, stating that Ms. Cady should not be required to endure a trial situation or face Benfield.

The Government then filed a request to take a videotape deposition of Patricia Cady in Arizona. On April 24, 1978, a hearing was held on this request and Dr. Gurland was called to testify. He stated that in his opinion Ms. Cady's psychiatric problems were directly related to her abduction.[3] He recommended that she not be required to testify or that circumstances less stressful than a trial courtroom be arranged. The trial court granted the request for a deposi-

tion and ordered that Benfield could be "present at the deposition but not within the vision of Mrs. Patricia Cady."

The deposition was held on May 11, 1978, in Tucson, Arizona. Benfield was excluded from the room in which the deposition took place. He was able to observe the proceedings on a monitor and halt the questioning by sounding a buzzer, at which time the deposition would be interrupted and Benfield's counsel would leave the room to confer with Benfield. The counsel was permitted to cross-examine Cady. However, Cady was apparently kept unaware of Benfield's presence in the building.

Thereafter, trial commenced in St. Louis on July 10, 1978. The videotaped deposition of Cady was admitted in evidence and played to the jury.[4] At the conclusion of the case, the trial court granted Benfield's motions for acquittal regarding the counts arising from interstate transportation of a stolen automobile. The remaining two counts were submitted to the jury and, as we have said, Benfield was convicted of misprision of felony but was acquitted of the charge of being an accessory after the fact.

Following the denial of various post-trial motions, Benfield brings this appeal. He raises several points. Because of the view we take of the case, we shall consider only two of the issues presented. First, were Benfield's constitutional rights as guaranteed by the sixth amendment violated by the procedures employed during the deposition of Patricia Cady? Second, under the facts of this case, is a second trial precluded by the acquittal of Benfield on the accessory after the fact charge?

The sixth amendment provides, in part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him

---

3. Ms. Cady's infirmity began several months after the kidnapping. It gradually worsened until she could no longer tolerate crowd situations and was unable to work.

4. The Government made only a marginal showing of Cady's unavailability at trial. No new evidence of her condition was presented. Instead, the Government relied on the failure of Dr. Gurland to notify them of any improvement in her condition. An additional showing of the witness's mental condition and availability on the trial date would have been a much better practice.

\* \* \*." These words express the commitment of our law to certain values in the determination of the guilt or innocence of those accused of crime. At first glance, the command that is embodied in that phrase seems so simple and unambiguous as to defy expression through any other words. It was adopted in response to supposed deficiencies in the original Constitution.[5] However, since the sixth amendment was ratified on December 15, 1791, it has been camouflaged by case law and nibbled by necessity. Today the Government urges that "face-to-face meetings" are not part of the rights guaranteed by the sixth amendment.

The courts have always been committed to giving obedience to constitutional commands. In *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), the Court interpreted the common-law and constitutional right of the accused to confront and challenge prospective jurors face to face. The Court seems to have been of the view that this and other sixth amendment rights were so important to the accused *and to the public* that they could not be waived. Twenty years later, the Court decided *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912). *Diaz* held that an accused who was not in custody could waive his right to be present at all times during the trial. *Diaz* distinguished and narrowly construed the holding of *Lewis*. 223 U.S. at 458, 13 S.Ct. 136.

The Supreme Court construed the sixth amendment's confrontation clause in at least three cases decided between 1895 and 1911. In *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), Mattox had been convicted at a trial in which the transcribed testimony of two witnesses given at a prior trial was admitted. At the time of the second trial, the witnesses were deceased. The Court recognized that the admission of this testimony was in conflict with the letter of the sixth amendment. However, the conviction was affirmed and the court stated:

> We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in the nature of a Bill of Rights are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of the accused, and farther than the safety of the public will warrant. \* \* \*

5. The complaints foreshadowing the sixth amendment were expressed by one anti-federalist, as follows:

> For the security of life, in criminal prosecutions, the bills of rights of most of the States have declared, that no man shall be held to answer for a crime until he is made fully acquainted with the charge brought against him; he shall not be compelled to accuse, or furnish evidence against himself—the witnesses against him shall be brought face to face, and he shall be fully heard by himself or counsel. That it is essential to the security of life and liberty, that trial of facts be in the vicinity where they happen. Are not provisions of this kind as necessary in the general government, as in that of a particular State? The powers vested in the new Congress extend in many cases to life; they are authorized to provide for the punishment of a variety of capital crimes, and no restraint is laid upon them in its exercise, save only, that "the trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be in the State where the said crimes shall have been committed." No man is secure of a trial in the county where he is charged to have committed a crime; he may be brought from Niagara to New York, or carried from Kentucky to Richmond for trial for an offence supposed to be committed. What security is there, that a man shall be furnished with a full and plain description of the charges against him? That he shall be allowed to produce all proof he can in his favor? That he shall see the witnesses against him face to face, or that he shall be fully heard in his own defence by himself or counsel?

No. II, Letters of Brutus (1788), *reprinted in* 1 B. Schwartz, The Bill of Rights: A Documentary History 508 (1971).

*The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of,* and many of the very cases which hold testimony such as this to be admissible also hold that not the substance of his testimony only, but the very words of the witness, shall be proven.

156 U.S. at 243–44, 15 S.Ct. at 340. (emphasis added).

The court again considered the right of confrontation in *Kirby v. United States,* 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890 (1899). Kirby was charged with receipt of stolen property. At trial the Government introduced the record of the conviction of third parties for theft of the property to establish that it had been stolen. The Supreme Court held that this procedure deprived Kirby of his sixth amendment rights:

The record showing the result of the trial of the principal felons was undoubtedly evidence, as against *them,* in respect of every fact essential to show *their* guilt. But a fact which can be primarily established only by witnesses cannot be proved against an accused—charged with a different offence for which he may be convicted without reference to the principal offender—except by witnesses who confront him at the trial, upon whom he can look while being tried, whom he is entitled to cross-examine, and whose testimony he may impeach in every mode authorized by the established rules governing the trial or conduct of criminal cases.

174 U.S. at 55, 19 S.Ct. at 577. It is clear that in *Kirby,* as in *Mattox* four years earlier, the Court viewed physical confrontation as an element of the sixth amendment guarantees. The same perception was expressed in *Dowdell v. United States,* 221 U.S. 325, 330, 31 S.Ct. 590, 592, 55 L.Ed. 753 (1911). There the Court noted that the constitutional provision was "intended to secure the right of the accused to meet the witnesses face to face, and thus to sift the testimony produced against him * * *." The *Dowdell* court noted there were well-recognized exceptions, one being where the appeal record was supplemented by the notes and recollections of the trial judge and court officials regarding events at trial. These cases show that prior to the availability of television, confrontation generally involved a face-to-face meeting with one's adversaries. *See also Snyder v. Massachusetts,* 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *Curtis v. Rives,* 75 U.S.App.D.C. 66, 123 F.2d 936, 938 (1941); H. Underhill, Criminal Evidence § 411 (4th ed. J. Niblack 1935).

In recent years, the Supreme Court and this court particularly have considered two aspects of the sixth amendment relevant to this case. In some situations it has been held that the accused forfeited or waived his confrontation rights. Other cases have held evidence admissible because of its reliability and importance despite the sixth amendment guarantee. The first aspect was clearly expressed in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), which held "that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." 397 U.S. at 343, 90 S.Ct. at 1060. The Court went on to say that the right could be reclaimed as soon as the defendant agreed to conduct himself properly. In *United States v. Carlson,* 547 F.2d 1346 (8th Cir. 1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), this court held that the defendant had waived his right of confrontation when he intimidated the prospective witness prior to trial. As a result of the intimidation, the witness refused to testify at trial and the Government was permitted to introduce the witness's grand jury testimony as substantive evidence of the defendant's guilt. 547 F.2d at 1358–60.

In *Carlson* we also discussed several of the Supreme Court cases that have con-

sidered the conditions under which out-of-court statements may be admitted as evidence despite absence of confrontation with the accused. 547 F.2d at 1356–57. Without prolonging this opinion with a discussion of those cases, we note that it has been held that when a witness is actually unavailable at trial his prior testimony may be admitted if sufficient indicia of reliability are present. *Mancusi v. Stubbs*, 408 U.S. 204, 216, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Barber v. Page*, 390 U.S. 719, 722, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); 5 Wigmore, Evidence § 1398 (Chadbourn rev. 1974).

The above exception to trial confrontation is reflected in the Federal Rules of Evidence and the Federal Rules of Criminal Procedure. Fed.R.Evid. 804(a) defines witness unavailability to include situations in which the declarant is unable to testify at the hearing because of then-existing physical or mental illness or infirmity. Fed.R. Crim.Proc. 15 [6] provides for the taking of depositions and their use at trial if the witness is unavailable at trial under Fed.R. Evid. 804(a). Rule 15 ensures the right of the defendant to be present at the taking of the deposition. If the defendant is in custody he is to be transported to the place of the deposition and be present at its taking unless he persists in disruptive behavior after being warned to act properly. If the defendant is not in custody he has the right to be present, "subject to such terms as may be fixed by the court." [7] In the present case the terms fixed by the trial court were that Benfield not be "within the vision" of witness Cady. As interpreted by the attorneys, this apparently extended to deceiving

---

**6.** Fed.R.Crim.Proc. 15 provides in pertinent part:

(a) When taken. Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition * * *.

(b) Notice of taking. The party at whose instance a deposition is to be taken shall give to every party reasonable written notice of the time and place for taking the deposition. The notice shall state the name and address of each person to be examined. * * * The officer having custody of a defendant shall be notified of the time and place set for the examination and shall, unless the defendant waives in writing the right to be present, produce him at the examination and *keep him in the presence of the witness during the examination*, unless, after being warned by the court that disruptive conduct will cause him to be removed from the place of the taking of the deposition, he persists in conduct which is such as to justify his being excluded from that place. A defendant not in custody shall have the right to be present at the examination upòn request subject to such terms as may be fixed by the court, but his failure, absent good cause shown, to appear after notice and tender of expenses in accordance with subdivision (c) of this rule shall constitute a waiver of that right and of any objection to the taking and use of the deposition based upon that right.

* * * * * *

(d) How taken. Subject to such additional conditions as the court shall provide, a deposition shall be taken and filed in the manner provided in civil actions except as otherwise provided in these rules, provided that (1) in no event shall a deposition be taken of a party defendant without his consent, and (2) the scope and manner of examination and cross-examination shall be such as would be allowed in the trial itself. The government shall make available to the defendant or his counsel for examination and use at the taking of the deposition any statement of the witness being deposed which is in the possession of the government and to which the defendant would be entitled at the trial.

(e) Use. At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used as substantive evidence if the witness is unavailable, as unavailability is defined in Rule 804(a) of the Federal Rules of Evidence, or the witness gives testimony at the trial or hearing inconsistent with his deposition. [Emphasis added.]

**7.** An argument can be made that the deposition of Cady violated Rule 15 in that the examination and cross-examination were not in the manner "such as would be allowed in the trial itself." However, as noted in the text, the rule permits the court to fix the terms governing the presence at the deposition of an accused who is not in custody. We decline to decide the case on this basis, in part because Benfield has not pressed this particular argument, but also because the terms of the rule apparently permit greater restriction of the presence of an accused who is not in custody than of the presence of an accused who is in custody. We do not wish to consider the equal protection impact of the rule on this record.

the witness as to the presence of Benfield in the building and his ability to hear and view the testimony as it was given.

After carefully considering the sixth amendment, applicable case law, and this record, we are satisfied that the rights of Benfield were abridged by the above procedure. Normally the right of confrontation includes a face-to-face meeting at trial at which time cross-examination takes place. *Mattox, Kirby, Dowdell,* and *Snyder,* which were discussed above, all support that view. While some recent cases use other language, none denies that confrontation required a face-to-face meeting in 1791 and none lessens the force of the sixth amendment. Of course, confrontation requires cross-examination in addition to a face-to-face meeting. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The right of cross-examination reinforces the importance of physical confrontation. Most believe that in some undefined but real way recollection, veracity, and communication are influenced by face-to-face challenge. This feature is a part of the sixth amendment right additional to the right of cold, logical cross-examination by one's counsel.[8] While a deposition necessarily eliminates a face-to-face meeting between witness and jury, we find no justification for further abridgment of the defendant's rights.[9] A videotaped deposition supplies an environment substantially comparable to a trial, but where the defendant was not permitted to be an active participant in the video deposition, this procedural substitute is constitutionally infirm.

In the present case there can be no serious contention that Benfield waived his right to be present voluntarily or through

misconduct. Even if we assume that the alleged involvement of a defendant charged with a crime against persons could be so heinous as to excuse the victim from facing him while testifying, the present case does not involve conduct of that magnitude.[10] Benfield did not threaten or personally harm Patricia Cady. To find a waiver or forfeiture in this case would destroy the right of confrontation in nearly all cases of alleged crimes against persons.

Here the right of confrontation was considerably curtailed by the procedures employed. What curtailment or diminishment might be constitutionally permissible depends on the factual context of each case, including the defendant's conduct. Too great an abridgment was made of defendant's confrontation right to pass constitutional muster. Basically the confrontation clause contemplates the active participation of the accused at all stages of the trial, including the face-to-face meeting with the witness at trial or, at the minimum, in a deposition allowing the accused to face the witness, assist his counsel, and participate in the questioning through his counsel. A further exception to the face-to-face aspect of the confrontation clause urged by the Government presents a too severe curtailment of this constitutional right. Any exception should be narrow in scope and based on necessity or waiver.

Today's decision should not be regarded as prohibiting the development of electronic video technology in litigation. Where the parties agree to a given procedure or where the procedure more nearly approximates the traditional courtroom setting, our approval might be forthcoming. Here the

---

**8.** Exclusion of the defendant from a deposition where testimony is taken for introduction at trial also potentially conflicts with the defendant's right of self-representation. 28 U.S.C. § 1654. *See generally Faretta v. California,* 422 U.S. 806, 816, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

**9.** The parties cited no cases specifically dealing with the absence of a defendant from a deposition due to no fault of the defendant. Our research revealed only *Collins v. State,* 12 Md. App. 239, 278 A.2d 311 (1971), which supports

our conclusion. *See also State v. Hewett,* 86 Wash.2d 487, 545 P.2d 1201, 1204 (1976).

**10.** *State v. Richey,* 107 Ariz. 552, 490 P.2d 558 (1971) held that it was permissible to examine the competency of a seven-year-old child abuse victim in the absence of the defendant. There is no suggestion that the child's substantive testimony was given without the defendant's presence. That case also involved a non-jury trial.

defendant was not allowed to confront the witness face to face and the witness was apparently unaware that her testimony was being monitored by the defendant.[11] While we do not doubt the truthfulness of Patricia Cady or that she has suffered a terrible ordeal, the accuracy of her perception of the events during the kidnapping and her recollection and expression of those events was crucial to the Government's case. The partial confrontation allowed was inadequate to test those features of her testimony. The conviction must be reversed.

■ The issue that remains is whether the Government should be permitted to retry Benfield if it so chooses. Benfield contends that the evidence was insufficient to support the conviction. We disagree. While some factual details and Benfield's intent were disputed, the jury was fully justified in reaching a guilty verdict. In fact, the record clearly discloses that Benfield had at some point knowledge of the kidnapping and made no attempt to notify the authorities, but on the contrary did, albeit reluctantly, aid and assist the kidnappers in carrying on and concealing the offense. Thus, while his intent remains an issue for jury determination, the undeniable facts support a conviction for misprision of felony.

■ It is also suggested that the acquittal on the accessory after the fact charge and the conviction on the misprision of felony charge were inconsistent. Even if we assume that the two were inconsistent, it is clear that inconsistent verdicts in a single trial do not form the basis for reversal of a conviction. *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Wetzel,* 488 F.2d 153 (8th Cir. 1973). Similarly, the criminal

rule of collateral estoppel found in *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), does not apply to verdicts of guilt and innocence rendered in a single trial. In this case Counts I and II do charge distinct crimes. We are reluctant to decide whether Benfield's acquittal on the accessory after the fact charge collaterally prevents a conviction on the misprision charge at a second trial. Our reluctance is grounded in our usual hesitancy to decide questions not fully briefed and argued by the parties as well as our knowledge that the question will be moot if the Government now declines to prosecute Benfield or if a second jury should acquit. Also, we are reluctant further to enlarge the collateral estoppel doctrine in cases involving multiple counts where the admitted facts are at odds with the jury finding conjectured by the plaintiff. This could lead to an absurd result.

■ On the record now before us, the fifth amendment issue does not present a clear bar to a retrial of the misprision count. Although not obligated to, Benfield could have notified the authorities of the kidnapping offense when he learned of it and before engaging in any of the affirmative actions of assistance or concealment.

The cause is reversed and remanded to the District Court for further proceedings consistent with this opinion.[12]

11. It is possible that face-to-face confrontation through two-way closed circuit television might be adequate. By a four to three vote, the Missouri Supreme Court has approved the use of such testimony by an expert witness in a case involving violation of a municipal ordinance, despite a defense based on the sixth amendment. *Kansas City v. McCoy,* 525 S.W.2d 336 (Mo.1975). Among the more disturbing aspects of the decision is that there was no showing of extraordinary circumstances necessitating reliance on the procedure.

12. In the interest of brevity we have omitted discussion of other issues raised on appeal. The argument raised by Benfield concerning pretrial delays is meritless. The other contentions, even if valid, would not prevent a second trial.