Timothy **CASEY**, et al.

v.

Helen **O'BANNON**, et al.

No. 81–5278.

United States District Court,
E. D. Pennsylvania.

March 23, 1982.

David Gates, Bristol, Pa., Susan Wood, Lancaster, Pa., Niles Schore, Clearfield, Pa., for plaintiffs.

Allen Warshaw, Molly McCurdy, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

In early November, 1981, defendants Helen O'Bannon, Secretary of the Department of Public Welfare, and Barry Roth, Director of the Office of Hearing Appeals, instituted new procedures which require that rejected applicants[1] for public assistance[2] pursue appeals in one of six regional hearing centers for a so-called face-to-face hearing. Those appellants who find travel to the regional site onerous, or impossible, have the option of presenting their cases to a hearing examiner over the telephone.

Plaintiffs[3], all indigent applicants for public assistance, primarily contend that their due process rights are violated because they have to travel to the required sites for a face-to-face hearing. As welfare recipients, or applicants therefor, plaintiffs assert that they are "poor", by definition, and that they are unable to travel the sometimes long distances to the regional centers. Hence, they contend that their statutory and constitutional right to a face-to-face hearing is an empty one since they are unable to exercise it. This forces them to pursue their claims in a purportedly constitutionally infirm forum: a telephone hearing.

Plaintiffs argue that telephone hearings are unconstitutional in that the hearing examiner is deprived of the opportunity to properly judge witness demeanor. Moreover, telephone hearings are frequently conducted by "conference call" whereby participants are not in the same room. This, plaintiffs asseverate, makes meaningful cross-examination of an adverse witness virtually impossible in that counsel can neither gauge visual reactions of witnesses nor discern when a witness testifies from memory or is using documents as an aid. Hence, plaintiffs argue that the conference call procedures violate settled notions of due process.

The challenged procedures, which became effective in November 1981, replaced procedures whereby each claimant had the opportunity for a face-to-face hearing at their County Board of Assistance. The former method required hearing examiners to travel from county to county to insure that they met face-to-face with claimants and witnesses. Defendants assert that the new procedures are necessitated by budgetary considerations.

 Turning now to the substance of plaintiff's allegations, the complaint is cast in both statutory and constitutional terms. Courts resolve cases whenever possible on statutory grounds and seek to avoid unnecessary constitutional adjudications. This, in fact, is a "cardinal principle". *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1931). Accordingly, we first inquire into relevant federal regulations which the

---

1. The new procedures govern applications for aid as well as those contesting a denial, reduction or refusal to increase benefit levels.

2. The regulations govern both Aid to Families with Dependent Children (AFDC) and Food Stamp programs.

3. Suit was instituted as a class action. The exigencies of the demand for preliminary injunctive relief have precluded counsel from moving for class certification. Hence, our reference to "plaintiffs" in this opinion is intended to mean only those individually named in this action.

procedures purportedly violate. The federal requirement is that a "hearing" be held at a "reasonable", 42 C.F.R. § 431.240(a)(1); 45 C.F.R. § 205.1(a)(8), and "accessible" place. 7 C.F.R. § 273.15(1)[4]. "Reasonableness" is, of course, a flexible term, it connotes and requires consideration of *all* relevant facts; "accessible" is a less flexible term, it focuses primarily on a claimant's ability to get to the hearing site. Both terms, however, relate to the location of the "hearing". This calls into question the type of "hearing" which is mandated. If telephone "hearings" are permissible, there is little dispute that they are "reasonably" and "accessibly" located. If telephone hearings are infirm, the question of the reasonability and accessibility of the six regional sites comes to the forefront of our decision.

Defendant urges us to rest our holding on the theory that the six regional hearing centers are "accessible" and "reasonably" located. If we agreed, we would, without more, hold on statutory grounds and avoid the underlying constitutional issues spawned by the telephone hearing process. However, while it might be "reasonable" under *all* the circumstances to have regional hearing sites, some claimants may not find them "accessible". For example, testimony adduced at the hearing demonstrates that, due to rural transportation problems, claimants residing in Clearfield County must leave their homes a day in advance in order to attend a face-to-face hearing. This problem is compounded by the fact that claimants are poor and frequently lack sufficient funds for transportation and overnight lodging for themselves and their witnesses. As such, the argument that the regional sites are not "accessible" strikes a responsive cord. Consequently, we examine plaintiffs' contention that they are forced to participate in an allegedly unconstitutional telephone hearing which deprives them of due process.

The question becomes this: given the fact that telephone hearings are generally "accessible"[5] and "reasonably" located, do they provide sufficient procedural safeguards to pass constitutional muster under the due process clause?

■ We begin our analysis of this issue with the observation that due process requires "an *opportunity* at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case." *Logan v. Zimmerman Brush Co.*, —— U.S. ——, ——, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (quotations omitted; emphasis is original.) This description echos the frequently articulated view that due process is a flexible concept, "protean in nature", *Chung v. Park*, 514 F.2d 382, 386 (3d Cir. 1975) and dependent upon the particular facts of each case. *Glenn v. Newman*, 614 F.2d 467, 472 (5th Cir. 1980). *See, Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975) (due process requires an "appropriate accommodation of the competing interests involved".) In determining the amount of legal process which is "due", courts delicately and carefully balance private and governmental interests with an eye toward determining whether the challenged procedure provides a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). In fact, a meaningful opportunity to be heard is a "due process maxim". *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 780, 100 S.Ct. 2467, 2472, 65 L.Ed.2d 506 (1980).

■ The specific test we apply in considering whether the process afforded is "due" requires inquiry into three discrete areas:

First, the private interest that will be affected by the official action; second,

---

4. *Sampayan v. Mathews*, 417 F.Supp. 60 (D.Guam 1976), held that Social Security claimants, forced to travel 3,000 miles from Guam to Hawaii, were effectively denied the "opportunity" for a hearing.

5. Hearing-impaired claimants automatically obtain a face-to-face hearing. Moreover, claimants without telephone service, and others who so desire, may have their telephone hearings at their County Board of Assistance.

the risk of an erroneous deprivation of an interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. at 334–35, 96 S.Ct. at 902–03.

The first factor, the private interest, is an important one to plaintiffs and weighs in their favor. Assistance programs, by definition, involve the means to obtain food, clothing, housing and medical care. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The second *Mathews* factor, the risk of an erroneous deprivation and the value of substitute procedures, requires reference to the manner in which the hearings are conducted and suggested improvements thereof. Plaintiffs' argument centers, in large part, upon their contention that the risk of an erroneous deprivation through telephone hearings is quite high. Their argument that telephone hearings are a fundamentally unfair method of adjudicating rights is bottomed upon a number of contentions: plaintiffs argue that while participating in such hearings they cannot see the witnesses who testify against them; they cannot see documents from which witnesses testify; they have no way of discerning when witnesses confer with, and aid, each other during testimony and, finally, the hearing officer is deprived of the opportunity to observe witness demeanor and meaningfully judge credibility. Plaintiffs also argue that they are unable to observe the hearing officer's reaction to the testimony adduced at the hearing. Hence, they complain, they are deprived of various non-verbal indicia such as "a nervous gesture . . . a bored or impatient look" [6] which would otherwise in-

dicate to counsel the need to modify the line of inquiry.

Defendants respond to this by asserting that the current conference call procedures, whereby the parties share the same line but are not physically present in the same room during the hearing, meets constitutional demands. Continuing, defendants point out that they are currently in the process of installing speaker phones in offices of the various County Boards of Assistance.[7] Once this process has been completed, claimants and their witnesses will have the additional procedural safeguards of being able to confer *inter se* in an unimpeded manner during the course of the hearing. They will also be able to observe so-called defense witnesses, frequently "welfare caseworkers", during their testimony. The impending use of speaker phones throughout the state successfully meets most of plaintiffs' objections to the current hearing system.

Plaintiffs' only complaint which survives the installation of the speaker phones is that the telephone hearings deprive the examiner of the opportunity to visually judge demeanor and credibility. True, visual observation of a witness is frequently an important tool to judge credibility; the question before the Court, however, is whether such visual contact is required to satisfy the constitutional requirement of a "hearing".

■ For present purposes, we conclude that plaintiffs have failed to carry the heavy burden [8] of convincing us that face-to-face hearings are required in the situations involved in this case. In reaching this conclusion we are influenced by the testimony adduced at trial which shows that hearing examiners can effectively judge credibility over the phone by noting voice responses, pauses, levels of irritation ·and

---

6. Plaintiffs' motion for a preliminary injunction at 19.

7. Testimony of defendant Roth, at 130–32. To date, approximately a dozen County Boards of Assistance have speaker phones.

8. Fed.R.Civ.P. 65(a) requires that plaintiffs must demonstrate a reasonable likelihood of success on the merits.

other factors.[9] Moreover, one survey shows that 82% of examiners who have presided over telephone hearings believe that they can properly judge credibility and that the procedure comports with due process.[10]

Finally, we draw upon *Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C.Cir.1980) which identified the constitutional contours of a "hearing". In *Gray Panthers*, the court considered a challenge to regulations promulgated by the Department of Health and Human Services whereby disputes for less than $100 were resolved by a "paper review", devoid of any "live" testimony. In a thoughtful opinion, the court held that the regulations offended due process considerations in failing to provide for an oral hearing. Although recognizing the value of face-to-face hearings[11], the court refrained from holding that they are constitutionally required. In fact, the court repeatedly emphasized that "simplified, streamlined, informal oral procedures" can comport with due process and are permissible. 652 F.2d at 172. All that is required is an "informal opportunity to talk with the decisionmaker"[12]. 652 F.2d at 165. In articulating the constitutional dimensions of an oral hearing, the court carefully described it as one simply "oral in nature".[13] In particular, permissible "oral hearings" are not synonymous with "formal evidentiary hearings". 652 F.2d at 148, n. 3. Again stressing the constitutionally permissible informal hearing which the Government must provide, the court stated that "core procedural rights" include an oral hearing "however informally provided". 652 F.2d at 156. Finally, the court noted that the regulations subject to that challenge were deficient, at

---

**9.** Testimony of Donald L. Blair, hearing examiner, at 45.

**10.** *Attitudes Towards the Use of the Telephone in Administrative Fair Hearings, The California Experience*, 31 Administrative Law Review 247 (1979).

One lawsuit raising similar issues was apparently settled prior to trial. Plaintiffs in *Okitkun v. Orbeck*, No. 76–8627 (Superior Court of Alaska) (filed November 22, 1976) sought relief from the method by which Alaska determined appeals regarding unemployment compensation. The procedures required appellants to travel substantial distances to one of five regional hearing sites or to submit claims upon "written interrogatories". Almost two years after filing suit, the parties entered into a stipulation of dismissal which created twelve additional regional hearing locations and provided for telephone conference calls in lieu of written interrogatories. Interestingly, plaintiffs there did not insist that due process could only be realized in face-to-face hearings; neither did they contend that a speaker phone was necessary to meet constitutional requirements. *See, Settlement of Agreement*, Section C, paragraphs 13–18; filed August 14, 1978.

**11.** *Gray Panthers v. Schweiker*, 652 F.2d at 163, n. 33 and 171 n. 53.

**12.** The requisite "informal" opportunity to speak with the decisionmaker is not surprising in view of the fact that "due process is not so rigid so as to require that the significant interests in informality, flexibility and economy must always be sacrificed." *Gagnon v. Scarpelli*, 411 U.S. 778, 788, 93 S.Ct. 1756, 1763, 36 L.Ed.2d 656 (1973).

**13.** Other courts have also wrestled with the problem of face-to-face confrontations and whether they are a constitutionally necessary ingredient for a "hearing". One early decision, *Commonwealth v. Gallo*, 275 Mass. 320, 175 N.E. 718 (1931), held that the Massachusetts constitution, which requires "face to face" confrontations between witnesses and the accused, was not violated when a witness' testimony from a prior trial was read into the record.

A more recent case, *United States v. Benefield*, 593 F.2d 815 (8th Cir. 1979) held that the Sixth Amendment requires that criminal defendants have the right to a physical, face-to-face confrontation with the government's witnesses; this, notwithstanding the fact that the witness/victim is psychologically traumatized from the crime. *See, Criminal Defendant has a Sixth Amendment Right to Physically Confront Witness at Video-Taped Deposition*, 4 Washington University Law Quarterly 1106 (1979).

Finally, *Kansas City v. McCoy*, 525 S.W.2d 336 (Mo.1975) held that the Sixth Amendment does not require the physical presence of an expert witness in a criminal case involving violation of a municipal ordinance. There, the court stated that a televised deposition of the expert, videotaped in the defendant's presence, could properly be relied upon at trial by the government. *See, Propriety of Allowing Absent Witness to be Examined Over Closed-Circuit Television*, 80 A.L.R.3d 1212.

These cases, each expressing somewhat divergent views, arise in the criminal context and concern application of the Sixth Amendment. Although they provide broad instruction, they are not directly applicable to civil cases, predicated upon the Fifth Amendment.

least in part, in that they failed to provide for "supplementary phone calls" to aid the decisionmaker. 652 F.2d at 170, n. 52.

Hence, we conclude that plaintiffs have failed to satisfy their burden that the constitution compels face-to-face hearings and that there is a risk of an erroneous deprivation by virtue of the telephone procedures as they currently exist. Additionally, substitute procedural safeguards are available and are being installed, i.e., speaker phones. These provide a method by which all interested parties (other than the examiner) meet in the same room and physically confront each other. This obviates the problem identified by plaintiffs, i.e., their lack of access to caseworker notes during testimony. The use of speaker phones permits counsel to be in the same room as all witnesses and provides additional safeguards to further insure a full and searching cross-examination.

We turn now to the third factor for consideration: the government's interest in the current procedures. We note here that due process does not shackle the government's ability to prevent the "drain of fiscal and administrative resources". In fact, governments can enact "procedures for prompt pre-termination hearings by skillful use of personnel and facilities". *Goldberg v. Kelly*, 424 U.S. at 266, 90 S.Ct. at 1019.

Defendants assert that the new procedures, enacted in the wake of declining governmental revenues, will result in savings of fifty to sixty thousand dollars per year in transportation costs plus additional unquantified savings resulting from quicker decisions [14] and fewer "frivolous" appeals. Defendants also argue that absent enactment of these new procedures they would be required to hire additional hearing examiners [15]. The resulting savings are not simply returned to state coffers. Rather, they represent monies available to claimants who qualify for benefits. As such, those efficiencies attributable to the new procedures help maintain the fiscal integrity of the social programs involved. In a very real sense, they "promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity".

Finally, in weighing the government's interest, "substantial weight must be given to good-faith judgments of the individual charged ... with the Administration of ... programs and the procedures that they have provided [to] assure fair consideration of the ... claims of individuals". *Matter of Bleaufontaine, Inc.*, 634 F.2d 1383, 1387–88 (5th Cir. 1981), *quoting, Mathews v. Eldridge*, 424 U.S. at 349, 96 S.Ct. at 909.

Additional issues have been raised: plaintiffs complain that the procedures violate AFDC regulations, 45 C.F.R. § 205.10(a)(5), which require a "clear expression" by the claimant that an appeal is desired. Pennsylvania requires that an appeal shall "specify the action appealed from and must be signed by the applicant". 55 Pa.Code § 275.4(a)(2)(ii). Defendant Roth testified that the barest, most minimal expression setting forth the reason for the appeal satisfies the regulation. If, for example, an appellant fills out the form requesting an appeal and simply notes that the matter was "wrongly decided", the appeal will not be dismissed. On the basis of an admittedly scant record on this point, we believe that this procedure does not offend federal regu-

---

**14.** Benefit levels continue pending appeal. Under the prior procedures claimants who appealed an adverse decision regarding benefit levels waited longer periods of time than they now do before having their appeal heard. Specifically, the average "turn around time" has decreased from 60 to 70 days under the old procedures to 45 days under the new procedures. Testimony of defendant Roth at 138. Hence, savings are realized when appellants have a prompt hearing. Those who prevail on appeal find it easier to continue their lives and plan upon the certainty of their benefit levels. Those who are unsuccessful on appeal have their benefits terminated quicker now than they would have under the old procedures. In either case, both parties and the public generally benefit from a prompt and proper adjudication of the rights involved. *Cf., Wagner v. Perkins*, 513 F.Supp. at 907 (a truly fair proceeding enhances the public interest and benefits the judicial system.)

**15.** Testimony of defendant Roth at 142.

lations.[16] On the contrary, a less demanding standard which could be met by something other than a "clear expression" might run afoul of the relevant federal regulations.

Finally, plaintiffs inveigh against the notice sent to claimants which describes the appellate hearing procedures. Additionally, plaintiffs complain that the failure to publish the new procedures violates due process. These issues were not extensively argued by counsel at the hearing and again, at this stage, we are unable to state that they violate the Fifth Amendment.

In order to prevail on a motion for a preliminary injunction, plaintiffs must demonstrate that irreparable harm will occur if relief is not granted pending a final adjudication on the merits, that there is a reasonable probability of success on the merits, that the possibility of harm to the non-moving party as well as to any other interested party will be minimal, and that the harm to the public will not be likely. *Continental Group, Inc. v. Amoco Chemical Corp.*, 614 F.2d 351, 356–57 (3d Cir. 1980); *Accord, Kennecott v. Smith Corp.*, 637 F.2d 181 (3d Cir. 1980); *Fitzgerald v. Mountain Laurel Racing Corp.*, 607 F.2d 589 (3d Cir. 1979).

Examination of the irreparable harm which plaintiffs will purportedly suffer discloses that three plaintiffs have already won their appeals; they clearly have suffered no harm. However, additional plaintiffs await either their hearings or the decision thereon. A wrongful denial of AFDC and/or food stamps would amount to a grievous loss to those plaintiffs. Hence, they have satisfied the requirement of showing irreparable harm.

However, as we have demonstrated, plaintiffs have failed to show, on this limited record, a likelihood of success on the merits. Additionally, we believe that harm will accrue to the non-moving party and to the public if we erroneously enter the requested preliminary injunction.

This case is not the "typical injunction case" wherein plaintiffs seek preliminary relief *pendente lite* in order to preserve the status quo. Here, plaintiffs seek an injunction to *change* the status quo pending a final adjudication. In such cases, plaintiffs should only taste the proverbial "fruits of victory" in the "clearest and most urgent" cases. *Rosenstiel v. Rosenstiel*, 278 F.Supp. 794, 801 (S.D.N.Y.1967). We find that plaintiffs have failed to carry this heavy burden.

We will enter an order denying plaintiffs' motion for a preliminary injunction.

---

**16.** None of the named plaintiffs had their appeal dismissed for failure to properly request an appeal. Hence, plaintiffs may lack standing to raise this claim. In view of our holding, however, we need not address this issue.