729 P.2d 1371

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Robert James TAFOYA,
Defendant-Appellant.**

No. 9004.

Court of Appeals of New Mexico.

Oct. 7, 1986.

Certiorari Denied Dec. 4, 1986. See 105 N.M. 94, 728 P.2d 845.

Paul G. Bardacke, Atty. Gen., Charles H. Rennick, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

John L. Walker, Albuquerque, for defendant-appellant.

## OPINION

GARCIA, Judge.

The convictions in this case arose out of a series of violent incidents in Albuquerque's Northeast Heights area in the fall of 1984. The jury found that defendant broke into the homes of six young girls and one adult woman in the middle of the night, woke them and committed sexual offenses on them. Victims two, five and seven identified defendant at a line-up. Defendant's

fingerprints were found at the crime scenes of all victims but victim four. Serology evidence consistent with defendant's characteristics was present in the cases of victims one and four. Defendant's defense was an alibi; he and family members testified that he was home, asleep, on the nights of all of the offenses.

Convicted of various counts of aggravated burglary, kidnapping, criminal sexual penetration with a deadly weapon, criminal sexual penetration of a minor, criminal sexual contact with a minor and aggravated battery, defendant appeals.

Defendant raises seven issues on appeal: (1) a claim of error in allowing five of the child victims to give videotaped testimony under circumstances in which defendant was made to sit in a control booth, thus denying him face-to-face confrontation with these victims; (2) a claim of error in allowing a prior consistent statement of one of the victims into evidence; (3) several claims of error in refusing to excuse certain jurors for cause; (4) a claim of error in the court's failure to strike expert testimony on fingerprints; (5) a claim of error that the line-up identification was unnecessarily suggestive; (6) a claim of error that the evidence was insufficient to support defendant's convictions as they relate to victim four; and (7) a claim of error that the sentence is illegal. Other issues, listed in the docketing statement but not briefed, are abandoned. *State v. Fish*, 102 N.M. 775, 701 P.2d 374 (Ct.App.1985), *cert. denied*, 102 N.M. 734, 700 P.2d 197 (1985). We find no error and affirm the convictions and sentences.

## 1. Face-to-Face Confrontation

Defendant contends that the court's allowance of a videotaped deposition procedure that required defendant to remain in a control booth during the taking of the testimony violated his right to confront the witnesses against him, contrary to U.S. Const. amend. VI. He also contends that the procedure violated the statute and rule permitting videotaped depositions, NMSA 1978, Section 30–9–17 (Repl.1984) and NMSA 1978, Crim.P.R. 29.1 (Repl.Pamp. 1985).

■ The statute and the rule require the deposition to be taken "in the presence of defendant" or require defendant to be "present." In relevant part the statute provides: "The videotaped deposition shall be taken before the judge in chambers in the presence of the district attorney, the defendant and his attorneys."

The statute and rule were enacted pursuant to the strong public policy of sparing child victims of sexual crimes the further trauma of in-court testimony. *State v. Vigil*, 103 N.M. 583, 711 P.2d 28 (Ct.App. 1985). Webster's Third New International Dictionary, p. 1793 (1971), defines "present" or "presence" as "being in one place and not elsewhere," "within reach," and "at hand." According to these definitions, defendant was present at the taking of the videotaped depositions. He was in a control booth and could view all of the proceedings. His attorney had a headset and microphone so that he could be in constant contact with defendant. Defendant was at hand and within reach. While he was not within the sight of the witnesses, in light of our strong public policy, we believe the requirement of presence intended by the legislature and our supreme court was satisfied. *Cf. State v. Lujan*, 103 N.M. 667, 712 P.2d 13 (Ct.App.1985).

■ We now turn to whether the procedure used in this case satisfied defendant's constitutional rights. We have already held in *Vigil* that upon a proper showing of unreasonable and unnecessary mental or emotional harm to the victim, a videotaped deposition, taken prior to trial and then shown to the jury, where the deposition is presided over by the court and where defendant has the opportunity to cross-examine the victim, does not violate the right of confrontation. The issue of face-to-face confrontation was not raised in *Vigil*. This

case requires us to answer the question of whether the absence of actual face-to-face confrontation can be justified under the rationale of *Vigil.* We hold that it can.

Defendant urges us to follow the cases of *United States v. Benfield,* 593 F.2d 815 (8th Cir.1979), and *Herbert v. Superior Court,* 117 Cal.App.3d 661, 172 Cal.Rptr. 850 (1981). *See generally* Annot., 19 A.L. R.4th 1286 (1983). In their requirement of face-to-face confrontation, these cases were concerned with the intangible effect that requiring the witness to testify in the face of his accuser has on the truth-seeking process:

> Most believe that in some undefined but real way recollection, veracity, and communication are influenced by face-to-face challenge.
>
> \*    \*    \*    \*    \*    \*
>
> The historical concept of the right of confrontation has included the right to see one's accusers face-to-face, thereby giving the fact-finder the opportunity of weighing the demeanor of the accused [sic] when forced to make his or her accusation before the one person who knows if the witness is truthful. A witness' reluctance to face the accused may be the product of fabrication rather than fear or embarrassment.

*Herbert,* 117 Cal.App.3d at 670, 671, 172 Cal.Rptr. at 855.

Defendant also relies on United States Supreme Court cases such as *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), and *Dowdell v. United States,* 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911). These cases contain language indicating that face-to-face confrontation is part of the sixth amendment. However, these cases also make clear that the general rule favoring confrontation sometimes must give way to considerations of policy and necessity. Thus, for example, dying declarations have always been an exception to the general rule regarding confrontation, lest the courts be put in the untenable

position of saying that criminals should go free because their victims die. *Mattox. See also Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In cases of necessity, such as where the witness is unavailable, *State v. Martinez,* 99 N.M. 48, 653 P.2d 879 (Ct.App.1982), *cert. denied,* 99 N.M. 47, 653 P.2d 878 (1982), or where a child witness would suffer unreasonable and unnecessary mental or emotional harm, a specific species of unavailability, *see Vigil,* and where the out-of-court statements bear adequate indicia of reliability, the sixth amendment does not preclude their admission.

The state, on the other hand, urges us to follow Wigmore's approach, 5 Wigmore, *Evidence* §§ 1365, 1395 (Chadbourne rev. 1974); *see also State ex rel. Human Services Dept. v. Gomez,* 99 N.M. 261, 657 P.2d 117 (1982), and hold that demeanor and other such intangibles form no part of the right of confrontation. Rather, they are simply incidental benefits of cross-examination, the major benefit of the right of confrontation. Indeed, Wigmore has gone so far as to say that cases requiring a face-to-face meeting between the accused and the accuser are "amusing legal pedantry," whose reasoning is "absurd." 5 Wigmore, *Evidence,* § 1399, n. 1 (Chadbourne rev. 1974).

We accept neither extreme position, but consider the rights of defendant together with those of the victims in light of the particular facts of this case. The cases on which defendant relies are not necessarily to the contrary. In neither *Herbert* nor *Benfield* was there a strong showing of necessity for dispensing with the requirement of face-to-face confrontation before the factfinder. By contrast, the testimony in this case was abundant that each child subject to the videotape procedure would suffer unreasonable and unnecessary mental or emotional harm from testifying face-to-face with defendant.

The primary reason for seeking the videotaped depositions in this case was that

the child victims did not want to see defendant and did not want defendant seeing them. The child victims ranged in age from four to eleven. All were suffering ill effects from the trauma of the crimes. A nine year old was refusing to sleep in her own room. She insisted on sleeping with two sets of undergarments and two sets of nightclothes on, in a sleeping bag on the floor of the family room in which her grandfather was staying. A four year old would not walk from room to room alone in her own house. An eleven year old regressed to insisting on sleeping with a nightlight on and with a teddy bear.

The expert testimony was that all the children were abnormally anxious and expressed their anxiety in particular when talking about the prospect of testifying in court in front of defendant. If required to testify in court in front of defendant, each child would have to undergo therapeutic intervention to repair the damage brought by simply testifying in that setting. Each professional who saw these children testified that the children would suffer unreasonable and unnecessary mental or emotional harm from having to testify in front of defendant. Some testified that the children ran the risk of becoming incoherent or "freezing" were they to see defendant. Both the statute and the court rule seek to protect victims from this kind of harm.

In addition, we question the need for face-to-face confrontation in this case. This is not a case in which the defense is that the child is fabricating the events and in which the moral suasion of facing the accused might influence the child to tell the truth. *Cf. Herbert.* In this case, a complete stranger invaded the bedrooms, sleep, and bodies of young victims. Only two of them were able to identify defendant in a line-up. They were not frightened of telling the truth in front of a known defendant. Rather, they were frightened at the prospect of being in the same room with the person believed to be their attacker.

Because the utility of face-to-face confrontation as an aid to eliciting the truth

was remote, *cf. State v. Owens,* 103 N.M. 121, 703 P.2d 898 (Ct.App.1984); *cert. quashed,* 103 N.M. 62, 702 P.2d 1007 (1985); *see also State v. Taylor,* 103 N.M. 189, 704 P.2d 443 (Ct.App.1985), because there was a sufficient showing that these children were unavailable to confront defendant face-to-face, *see Vigil,* and because the videotape procedure provided defendant with a full opportunity to cross-examine the victims, *Vigil,* we hold that his confrontation rights were not abrogated by the procedure. *See Ohio v. Roberts.*

## 2. Prior Statement

Victim six was four years old. She was awakened by a man in her bedroom, carried into the family room, forced to perform fellatio, and put back to sleep. At first, she thought the man was her father because he was the only adult male she knew. Later, she came to understand that the "bad man" was not her father.

Victim six gave a videotaped statement to the police four days after the incident. During her videotaped deposition, taken as a substitute for trial testimony, she was cross-examined about her initial impression that it was her father who took her out of her room. She was further cross-examined about the number of times she had gone over her story with her mother or others. Included in the cross-examination was reference to the prior videotaped statement. During the redirect examination, the state moved for admission of the prior statement, pointing out that, while the state did not wish it to be played during the deposition, it would want it played for the jury after the videotaped deposition was played at trial. Defense counsel pointed out that he was not present during the police statement and asked the court to review the statement before making a decision on the matter. The court took the matter under advisement and the videotaped deposition was concluded. At trial, defendant objected to the introduction of the police statement and he contends, on appeal, that the

statement was inadmissible under the rules of evidence and denied him his right of confrontation.

■ NMSA 1978, Evid.Rule 801(d)(1)(B) (Repl.Pamp.1983) allows the introduction of prior consistent statements if they are offered to rebut an expressed or implied charge of recent fabrication or improper influence or motive. Defendant contends that, while he cross-examined victim six as to her general credibility and as to confusion regarding who her attacker was, he did not charge recent fabrication or improper influence. We disagree. An attack on general credibility satisfies the recent fabrication element. *State v. Vigil.* Moreover, the cross-examination concerning the victim's change in story and the number of times she discussed her testimony with her mother and others amounts to a charge of improper influence.

■ Nor were defendant's confrontation rights violated by the procedure. Defendant argues the issue as though he had no inkling that the police statement would be introduced until the trial, at which time he had no opportunity to cross-examine the victim on her statement. This argument ignores the procedure in the trial court, in which the statement was first introduced at the deposition, which defendant knew was being taken as a substitute for trial testimony and at which time he could have cross-examined the victim. Actual cross-examination is not the test for whether confrontation rights are satisfied; it is the *opportunity* for cross-examination which is the key. *State v. Massengill*, 99 N.M. 283, 657 P.2d 139 (Ct.App.1983). Under the circumstances, the trial court did not err in admitting the prior consistent statement.

### 3. Jury Issues

■ Defendant contends that he was denied his right to a trial by a fair and impartial jury. His brief details several complaints. We need not repeat them here. With regard to some of the complaints, defendant declined the court's offer of cure and, therefore, cannot now be heard to claim reversible error. *Cf. State v. Vialpando*, 93 N.M. 289, 599 P.2d 1086 (Ct.App.1979), *cert. denied*, 93 N.M. 172, 598 P.2d 215 (1979). With regard to others, defendant informed the trial court that he was satisfied with the particular jurors and cannot complain on appeal of actions he consented to in the trial court. *Cf. State v. Gilbert*, 100 N.M. 392, 671 P.2d 640 (1983). Finally, a juror who was alleged to be sleeping during portions of testimony was not proved to be sleeping. The juror admitted she had her eyes closed and was nodding, but denied she slept during the trial. The conflict between what appeared and the juror's testimony was for the trial court to resolve. *See State v. Case*, 100 N.M. 714, 676 P.2d 241 (1984). There was no abuse of discretion in either this or any of defendant's jury issues.

### 4. Fingerprint Evidence

Latent prints were found at the scene of each of the crimes charged in the indictment. Officer Gallegos was qualified as an expert in fingerprint analysis without objection from defendant. He testified that the workable latent prints found at the crime scenes were defendant's prints. On cross-examination, he explained generally, but not specifically, how he compared the latent prints against defendant's known set of prints. He explained that he looked for patterns and characteristics and then, once characteristics were the same, he compared the number of ridges between the characteristics. There were no unexplainable discrepancies, and the officer did not feel that it was useful to speak in terms of a certain number of points of comparison. As far as he was concerned, a positive comparison was a matter of the examiner's judgment as to when he feels comfortable with his opinion.

Defendant expended a great deal of time and energy cross-examining all of the officers who lifted and examined the latent

prints. The thrust of this examination was to show that the police could have, but did not, photograph the latent prints to show that they were, in fact, on the objects from which the officers claimed to have lifted them. The police had a set of defendant's fingerprints, which did not include palm prints, from several years before these incidents when defendant was arrested for a similar crime. The officers admitted that it was possible to tamper with prints but, contrary to defendant's assertion, they did not say it was possible to transfer prints from one card to another.

In closing argument, defendant argued to the jury that it was possible in this case for the police to have tampered with the print evidence so that the latents allegedly found at the crime scenes were, in fact, taken from defendant's prior known set of prints. He argued that this possibility. would have been excluded had the police photographed the latent prints as they were found on the various objects. The officers had testified, however, that the purpose of print photography was not to exclude the possibility of tampering but was rather to preserve the latent print and exclude the possibility that it would be destroyed in the attempt to transfer it onto a card.

Based on these facts, defendant raises two issues on appeal. First, he contends that the court should have stricken the testimony of the fingerprint expert because the expert was unable to satisfactorily explain how he arrived at his opinion. *See Smith v. Klebanoff,* 84 N.M. 50, 499 P.2d 368 (Ct.App.1972). Second, he contends that the state deprived him of due process by not preserving, by photography or otherwise, the evidence upon which the latent prints were allegedly found. *See State v. Lovato,* 94 N.M. 780, 617 P.2d 169 (Ct.App. 1980).

Defendant's brief does not inform this court how the second issue was preserved for appellate review. *See State v. Martin,* 90 N.M. 524, 565 P.2d 1041 (Ct.App.1977),

*cert. denied,* 90 N.M. 636, 567 P.2d 485 (1977). Issues not preserved for review in the trial court need not be considered on appeal. NMSA 1978, Crim., Child.Ct., Dom.Rel. & W/C App.R. 308 (Repl.Pamp. 1983). For these reasons, we consider defendant's due process issue no further. On the merits, however, *see State v. Chouinard,* 96 N.M. 658, 634 P.2d 680 (1981), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982); *State v. Duran,* 96 N.M. 364, 630 P.2d 763 (1981).

■ With regard to the first issue, defendant's complaint is that:

Mainly, the witness testified that there was no generally accepted scientific requirement that a print examiner find, and be able to explain, any particular number of points of similarity or comparison. As trial counsel indicated at the motion hearing, this testimony flies in the face of scientifically established fingerprint techniques relied upon by most examiners, including the Federal Bureau of Investigation in its training of other cc [sic] examiners.

There are several problems with defendant's argument. First, Gallegos was the only fingerprint expert that testified at trial, and despite defendant's complaint about his testimony, his testimony stands uncontradicted that there are no particular number of points of comparison necessary to a valid opinion. Arguments of counsel are not evidence. *See State v. McGill,* 89 N.M. 631, 556 P.2d 39 (Ct.App.1976). Second, for purposes of the hearing on defendant's motion to strike the fingerprint examiner's testimony, defendant relied on a book appearing to require twelve points of comparison. The book is not before this court as part of the record on appeal. It is defendant's burden to bring up the necessary record on appeal, and failing that, there is nothing for this court to review. *State v. Duran,* 91 N.M. 756, 581 P.2d 19 (1978).

Third, within the context of his testimony, the witness satisfactorily explained how

he arrived at his opinion. He spoke about pattern, characteristics, ridges and the absence of unexplainable discrepancies. On cross-examination, defendant never sought to shake the expert from his opinion and did not point to a single comparison in which there was any discrepancy whatsoever. Under NMSA 1978, Evid.Rule 705 (Repl.Pamp.1983), the expert may testify to his opinion and may be required to disclose the underlying facts on cross-examination. In this case, defendant never pressed him on the underlying facts on cross-examination. Accordingly, there was no error in the refusal to strike his testimony.

### 5. Line-up

We have considered defendant's claim that the line-up identification was unnecessarily suggestive and we have found it to be without merit.

### 6. Sufficiency of Evidence

Defendant asserts that the convictions for the crimes relating to victim four are not supported by substantial evidence. We disagree. While there was neither an identification nor fingerprint evidence for victim four, the state relied on serology evidence and on the fact that the crimes against victim four fit the same pattern or modus operandi as defendant's pattern in the other crimes for which he was convicted. Evidence of other crimes has a strong probative value when there is sufficient evidence of similar characteristics of conduct in each crime to show the perpetrator of the other crime and the perpetrator of the crime for which defendant has been charged is one and the same person. *Mayes v. State*, 95 Nev. 140, 591 P.2d 250 (1979). Here, there is evidence of sufficient similarity between the crimes against victims two, three and five to give logical force to an inference that the one who committed these crimes also committed the crimes against victim four.

Victim four falls into a grouping of four incidents that involved young girls between the ages of nine and eleven who were targets of sexual assault, committed by a stranger who entered their homes without consent, at night, after the household was asleep. All of the attacks occurred in the same small geographical area of town and two of the victims, including victim four, lived on the same street. Moreover, these attacks occurred within close temporal proximity, since they occurred in approximate two-week intervals. The evidence supports an inference that someone identified these children in advance and entered the houses looking for a specific victim. This is a distinctive pattern from which the jury could infer that the person who committed the offenses as to victim four was the same one whose fingerprints were found and who was identified by the victims in two of the other incidents.

The state also presented serology evidence. Victim four is blood type A, PGM 1 and is a secreter. Defendant is blood type B, PGM 1 and also is a secreter. Evidence of B acid phosphatase was found on the clothing of victim four. On the basis of the evidence presented, the jury could logically infer that defendant was indeed the perpetrator of the crimes against victim four. Evidence must be viewed in the light most favorable to the jury's verdict, and all reasonable inferences must be allowed in support thereof. *State v. Tovar*, 98 N.M. 655, 651 P.2d 1299 (1982). Viewing the record as a whole, we conclude there was substantial evidence introduced to allow the jury to find defendant guilty of the crimes relating to victim four.

### 7. Sentence

Since we affirm defendant's convictions on all counts, defendant's issue regarding the unspecified suspension of part of his sentence is moot.

We have considered defendant's other arguments under this and other issues and find them to be without merit.

The convictions and sentences are affirmed.

IT IS SO ORDERED.

MINZER and FRUMAN, JJ., concur.